REPORTED
IN THE COURT OF SPECIAL APPEALS
No. 826
September Term, 2014

KAMAL MUHAMMAD
A/K/A MELVIN CALDWELL

v.

STATE OF MARYLAND

Eyler, Deborah S.,
Arthur,
Friedman,

JJ.

Opinion by Eyler, Deborah S., J.

Filed: May 29, 2015

In this appeal we hold that the Circuit Court for Baltimore City erred by admitting into evidence, as a prompt complaint of sexual assault, a factually detailed prior consistent statement of a sexual assault victim; and that the error was not harmless beyond a reasonable doubt.

Melvin Caldwell, a/k/a Kamal Muhammad, the appellant, was charged with numerous crimes arising out of the stabbing of L.M. in a vacant row house in Baltimore City. A jury convicted him of attempted second-degree murder, first-degree assault, second-degree assault, possession of a deadly weapon with intent to injure, and fourth-degree sex offense.[1] He was sentenced to imprisonment for 30 years for attempted second-degree murder, three years for possession of a deadly weapon, and one year for fourth-degree sex offense, with all terms to run consecutively. The assault convictions merged for sentencing. The appellant noted a timely appeal.

## FACTS AND PROCEEDINGS

At trial, the State presented evidence showing the following. On July 21, 2012, at around 8:00 p.m., Detective Willie Craft of the Baltimore City Police Department ("BPD") was patrolling in the "Lafayette corridor" in central Baltimore when he received a call to respond to 637 West Lafayette Street, a vacant end-unit row house at the corner of Lafayette Street and Argyle Avenue ("the row house"). It only took Detective Craft a little over a minute to get to the row house. There he saw two women standing across the street. They

---

[1]The jury acquitted the appellant of attempted first-degree murder, attempted first-degree rape, attempted second-degree rape, first-degree sexual offense, second-degree sexual offense, and third-degree sexual offense.

motioned to him and reported that they had heard "screaming" coming from inside the row house. Detective Craft walked to the front of the row house and heard "a loud cry for help" and "moaning." The voice sounded like a woman. The doors and windows of the row house were boarded up. Detective Craft tried to pull the plywood off the front door, but was unable to gain entry.

Within minutes, two more police officers arrived at the scene. Detective Craft directed them to stand by the front door while he went around to the back. He ran through an empty lot next to the row house. As he approached the rear of the row house, he saw a "naked black male," later identified as the appellant, walking in a crouched position just outside a wall that surrounded the backyard of the row house. He appeared to be carrying clothing. Detective Craft loudly identified himself as a police officer and yelled for the appellant to stop. The appellant took off running into a wooded area in the empty lot.

Detective Craft pursued the appellant on foot. The appellant dropped the items he was carrying and continued to run. Detective Craft caught up with him, forced him to the ground, and placed him in handcuffs. Detective Craft noticed scratch marks on the appellant's face.

Detective Craft asked the appellant if anybody was inside the row house. The appellant replied, "No, Officer, nobody's in there." Detective Craft then asked whether there was a "woman injured inside the dwelling." The appellant said, "I don't know. I don't know. I don't know."

2

By then, more police officers had arrived. They took custody of the appellant. Detective Craft and another officer entered the row house through the back door. The plywood covering that door had been partially pried off, permitting ingress and egress. Inside, they found L.M. lying naked in a pool of blood next to a blood-soaked mattress. She had multiple stab wounds to the side of her neck and one stab wound to the back of her head. On the mattress was a black-handled knife, covered with blood. L.M. was moaning softly and her eyes were "flicker[ing]." She did not speak to the officers. She was transported to the University of Maryland Shock Trauma Unit ("Shock Trauma").

Detective Craft recovered the items the appellant had dropped as he fled. They included men's clothing; a woman's pocketbook that contained an identification card for L.M., a syringe, and a bottlecap; and a wallet with numerous identification cards for the appellant.

Early the next morning, Detective Robert Bell, who was assigned to the BPD's Sex Crimes Unit, transported a sexual assault forensic examination ("SAFE") nurse, Ben Lebovitz, to Shock Trauma.[2] Nurse Lebovitz performed a SAFE examination on L.M., who was intubated and sedated at the time. He observed bruising on her forehead, pooling of blood around her right eye, swelling on her right cheek, and multiple abrasions around her tongue. Two of L.M.'s front teeth were missing, one on the top and one on the bottom, and

---

[2]The SAFE program is run exclusively out of Mercy Medical Center in Baltimore. Detective Bell went to Mercy, picked up a SAFE kit, and transported the kit and Nurse Lebovitz from Mercy to Shock Trauma.

3

another bottom tooth was loose. There were numerous internal and external abrasions around L.M.'s vagina. Nurse Lebovitz took oral, vaginal, anal, and fingernail swabs and a blood sample from L.M.

Detective Bell obtained a warrant to collect forensic evidence from the appellant. Around 10:00 a.m., he and Nurse Lebovitz met with the appellant at the police station. Nurse Lebovitz "took facial swabs from [the appellant's] face, oral swabs from the inside of his mouth, blood from his fourth finger on his right hand[,] . . . fingernail scrapings[,] head hair pullings, pubic hair co[mbings], and pubic hair pullings." Detective Bell photographed the appellant's face. The samples all were submitted for DNA analysis.

L.M. underwent surgery for her injuries. On July 25, 2012, four days after she was stabbed, her breathing tube was removed and she was brought out of sedation, which enabled her to speak. Detective Bell interviewed her at Shock Trauma that day. We shall discuss that interview *infra*.

L.M. testified that she was 52 years old and had been a heroin addict for over 20 years, including at the time of the events at issue. (She claimed to have stopped using heroin about five months before the trial.) On July 21, 2012, she spent the morning helping a friend set up his booth at Artscape. That afternoon, her sister called and invited her to a crab feast for her brother-in-law's birthday. Around 3:00 p.m., she walked to Argyle Avenue to purchase heroin to bring with her to the crab feast. She noticed the appellant walking behind her, "stalking" her. As she walked past a "gully," he grabbed her from behind, placing a choke

4

hold around her neck. He told her he was "BGF" and that she wasn't "paying [her] dues in the neighborhood." She began having difficulty breathing because the appellant's forearm was pressed against her throat. He told her she would be "kicking out some pussy," which she understood to mean he was going to rape her.

After that, L.M. "blacked out." When she awoke she was lying on a mattress inside a vacant house with her pants off. The appellant was naked and was straddling her with his penis in her face. He told her to "[s]uck [his] dick." He also told her she would not be "leaving anytime soon" and that she should "take the rest of [her] stuff off," including her jewelry, so as not to scratch him. After L.M. removed her clothing and jewelry as directed, the appellant put his penis in her mouth.

Thinking the appellant was going to kill her, L.M. decided to bite his penis and try to escape. As the appellant put his hand on her forehead and began to push her away from him, she "bit as hard as [she] could." In response, he punched her in the face repeatedly, knocking out some of her teeth. At that point, his penis fell out of her mouth and she jumped up and ran to a boarded up window. She screamed, "Help me, help me." The appellant grabbed her and said, "You're going to die." She was "fighting and grabbing his face and scratching him." He pushed her to the ground and pressed his "thumbs in [her] neck," causing her to lose consciousness again. The next thing L.M. remembered was waking up surrounded by "people in all white," who told her she was at Shock Trauma.

5

A DNA analyst testified that she tested 13 samples taken from the knife, a pair of boxer shorts found outside the row house, a white sock found inside the row house, L.M.'s body, and the appellant's body against known samples taken from L.M. and the appellant. L.M. was the "major contributor" to DNA found on the knife blade, the knife handle, and the white sock. The DNA of an "indeterminate minor contributor" also was found on the knife blade, one stain on the knife handle, and the white sock. The sample from L.M.'s fingernails revealed a "mixture" of DNA from L.M. and the appellant. The sample from the appellant's fingernails revealed his DNA and DNA from a minor indeterminate contributor. L.M.'s DNA was not found in the swabs taken from the appellant's penis or from his facial scratches.

Nurse Lebovitz testified generally about SAFE examinations and specifically about his SAFE examination of L.M. Over objection, he opined that "abrasions" to the "lower part of the vagina" such as those he observed during L.M.'s SAFE examination are common injuries caused by the insertion of a penis into the vagina during a sexual assault.[3]

The appellant testified in his own defense, as follows. On July 21, 2012, he was living inside the row house because he was homeless. That morning, he ran into L.M. as he was walking in the neighborhood. They were friends. The two spoke briefly. Later that afternoon, he again saw L.M. on the street. They went to the row house for an agreed

---

[3]The charges against the appellant included first and second-degree rape. At the close of the State's case, the court granted the appellant's motion for judgment of acquittal on those charges.

6

"exchange" of "sex for drugs." They walked together through a narrow alley that connects Argyle Avenue to the backyard of the row house and entered the row house through the back door.

Once inside, the appellant told L.M. to wait while he went to the adjacent vacant row house to get drugs that he kept there. He left and returned with "two ten-dollar pills of cocaine in a rock form[,] one capsule of heroin[,] and [a] ten-dollar bill." He gave all of these items to L.M. She "proceeded to smoke the crack . . . in a glass pipe." She placed the heroin in a "soda bottle cap," cooked it with a cigarette lighter, and then used a syringe from her pocketbook to inject it.

A few minutes later, L.M. removed her clothes and lay down on the mattress. The appellant took off his clothes too and sat on the mattress next to her. He "really wasn't in the mood," however. Moments later, an "unknown guy" burst into the room and attacked both of them. The man was holding a "shiny object" that the appellant at first thought was a gun. The appellant wrestled with the man. The man said, "kick it out or you're going to die," which the appellant understood was a demand for drugs. The appellant told the man he didn't have any drugs. L.M. was screaming and repeatedly "running into this guy." At one point, L.M. scratched the appellant's face as she tried to fend off the assailant. The appellant heard "[L.M.] hit the floor." He saw the assailant run out of the room, but did not know if he had left the row house. Because the appellant was "scared for [his] life," he ran too. He

7

"grabbed" clothing off of the chair as he left, but couldn't see what he was taking because it was so dark in the room.

The appellant exited the row house through the back door and ran a short distance to the empty lot, where he fell down. He sat on the ground for a few minutes until he heard Detective Craft say, "Police. Get on the ground." Detective Craft had his gun drawn. The appellant got down on his stomach and the detective handcuffed him. According to the appellant, Detective Craft did not ask him any questions about who was inside the row house.

On appeal from his convictions, the appellant poses seven questions for review.[4] Because we find merit in Question 4, challenging the admission of a detailed out-of-court oral statement by L.M. as a prompt complaint of sexual assault, we shall reverse the

---

[4]As presented by the appellant, the questions are:

1. Was the trial court's behavior in interjecting itself in the trial by questioning witnesses and forcing defense counsel to reveal his theory of defense under threat of contempt so egregious that it denied Mr. Muhammad his right to a fair trial?

2. Did the trial court abuse its discretion by not allowing Mr. Muhammad to introduce evidence of inconsistent statements L.M. gave to police?

3. Did the trial court err by permitting L.M. to give irrelevant and highly prejudicial victim impact testimony?

4. Did the trial court err by permitting Detective Bell to recount an extensive prior consistent statement under the prompt complaint exception to the hearsay rule?

5. Did the trial court abuse its discretion by excluding evidence of a prior conviction against L.M.?

6. Did the trial court abuse its discretion by not allowing a defense expert to testify about alternative explanations for the SAFE Nurse's findings?

7. Alternatively, did the court abuse its discretion by letting the SAFE Nurse give an opinion that had no more factual basis than that of the defense expert that had been excluded?

8

judgments and remand the case for further proceedings. As the other issues are not likely to arise on remand, we shall not address them.

## DISCUSSION

On direct examination, the prosecutor asked Detective Bell to describe L.M.'s demeanor during the interview at Shock Trauma, when he asked her to tell him what had happened on July 21, 2012. The detective responded that L.M. was "calm" at first, but then became "emotional and began to cry." The prosecutor requested a bench conference, which was granted.

At the bench, the prosecutor said he planned to ask Detective Bell to recount "the statement that he took from [L.M.] at that time," *i.e.*, the oral statement L.M. made to him at Shock Trauma. The court asked "what exception to the hearsay rule will that fall [under]." The prosecutor argued that it was admissible either as an excited utterance or as a prompt complaint of sexual assault. Defense counsel responded that the lapse of time between the traumatic event and the statement was too long for it to qualify as an excited utterance and that the prompt complaint of sexual assault exception to the rule against hearsay does not apply when the complaint is made in response to police questioning.

The court ruled that the statement was not an excited utterance and that the prosecutor had not yet laid a proper foundation to satisfy the prompt complaint of sexual assault exception. It permitted the prosecutor to pose additional questions.

9

In the resumed direct examination of Detective Bell, the prosecutor established that July 25, 2012, was the first day after the stabbing that L.M. could speak because she had been sedated before then. The following exchange then occurred:

> [PROSECUTOR]: And can you tell the ladies and gentleman of the jury what [L.M.] related to you [in the interview at Shock Trauma]?
>
> [DETECTIVE BELL]: Yes. She told me on the 21st of July around 6 p.m., she has been speaking to her sister on the phone. She was walking on the street near Argyle Avenue at West Lafayette near a grassy area which had some woods with some trees and a black male came out of the bushes, approached her –
>
> [DEFENSE COUNSEL]: Your Honor, we object to this.
>
> THE COURT: Overruled.
>
> [DETECTIVE BELL]: Told her he was BGF, a bushwacker, put her in what she described as a sleeper hold. She then stated she woke up in a vacant house and she was naked, and he told her to suck his dick, and if she did as he wanted he wouldn't injure her. So she started performing oral sex on him and at some point bit his penis. He then screamed and started to beet [sic] her about the head and face. She further stated that she attempted to defend herself by scratching him in the face and she may have grabbed onto a lamp and she was pushed onto the ground and beaten further. And then she recalls speaking to a paramedic and then after that she doesn't remember anything else.

Before this Court, the appellant contends the trial court erred by admitting into evidence, under the prompt complaint of sexual assault exception to the rule against hearsay, the details of L.M.'s oral statement to Detective Bell, beyond that she was sexually assaulted by the appellant on July 21, 2012, in the row house. The State responds that the trial court did not err and, if it did, any error was harmless.

10

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." Md. Rule 5-802. Whether evidence is hearsay is an issue of law that we review *de novo*, as is whether hearsay evidence properly was admitted under an exception to the rule against hearsay. *Bernadyn v. State*, 390 Md. 1, 7-8 (2005).

L.M.'s oral statement to Detective Bell was hearsay, as it was an out-of-court statement offered at trial to prove its truth. Therefore it was not admissible unless it met the requirements of one of the hearsay exceptions. Under Rule 5-802.1, certain hearsay statements by witnesses who testify at trial and are subject to cross-examination are admissible, substantively, as exceptions to the rule against hearsay. One such exception, set forth at Rule 5-802.1(d), is "[a] statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony." That rule is based on the long recognized Maryland common law hearsay exception for a victim's timely complaint of a sexual assault. *See Parker v. State,* 67 Md. 329 (1887).

Originally, the purpose of the prompt complaint of sexual assault exception to the rule against hearsay was to allow the State to preemptively rebut the then-prevalent adverse inference that a woman who does not immediately complain about being sexually assaulted

11

must have consented to the sexual act.  As the *Parker* Court explained, in language reflecting

the "natural law" view of women's role in society that predominated in the late 1800's:

> When an outrage has been committed on a woman, the instincts of her nature
> prompt her to make her wrongs known, and to seek sympathy and assistance.
> The complaint which she then makes is the natural expression of her feelings.
> It may therefore be shown in evidence as a circumstance, which would usually
> and probably have occurred in case the offence had been committed.

67 Md. at 331.[5]  In *Parker*, the prompt complaint of sexual assault was made by the victim

to her mother. The Court held that the fact of the complaint having been made was

---

[5]The "natural law" doctrine is well illustrated by the following observations by Justice
Bradley, in a concurring opinion in *Bradwell v. State*, 83 U.S. 130 (1872), in which the
Supreme Court rejected a constitutional challenge to an Illinois law banning women from the
practice of law:

> [T]he civil law, as well as nature herself, has always recognized a wide
> difference in the respective spheres and destinies of man and woman. Man is,
> or should be, woman's protector and defender. The natural and proper timidity
> and delicacy which belongs to the female sex evidently unfits it for many of
> the occupations of civil life. The constitution of the family organization, which
> is founded on divine ordinance, as well as in the nature of things, indicates the
> domestic sphere as that which properly belongs to the domain and functions
> of womanhood. The harmony, not to say identity, of interests and views which
> belong, or should belong, to the family institution is repugnant to the idea of
> a woman adopting a distinct and independent career from that of her husband.
> * * *
> It is true that many women are unmarried and not affected by any of the duties,
> complications, and incapacities arising out of the married state, but these are
> exceptions to the general rule. The paramount destiny and mission of woman
> are to fulfil the noble and benign offices of wife and mother. This is the law
> of the Creator. And the rules of civil society must be adapted to the general
> constitution of things, and cannot be based upon exceptional cases.

*Id*. at 141-42.

admissible but the trial court erred in permitting the mother to recount the victim's narrative of the events surrounding the sexual assault.

In *Blake v. State*, 157 Md. 75 (1929), the Court of Appeals made clear that the prompt complaint of sexual assault hearsay exception is not restricted to testimony establishing that a complaint was made. In a case in which the fact of the assault was not contested, but the identity of the assailant was, the Court observed:

> It has not been the practice in this state to restrict the testimony of a complaint to a mere yes or no answer. Some statement of the nature of the complaint has been regarded as admissible, at least for the purpose of showing the character of the act complained of, and we think this a proper application of the rule.

*Id.* at 79. Two years later, in *Green v. State*, 161 Md. 75 (1931), the Court further clarified that, "[i]f the complaint is admissible, it would seem sensible and logical to require the terms and circumstances of the [victim's] declaration likewise to be offered in evidence." *Id.* at 81. *See also Guardino v. State*, 50 Md. App. 695, 706 (1982) ("[I]t is established in Maryland that a complaint by a rape victim may be admitted as original evidence primarily to support the testimony of the victim as to the time, place, crime, and name of the wrongdoer."). The *Green* Court explained that for the prompt complaint to be admissible, it had to "concur with the indictment in the unities of time, place, act, and actor." *Green*, 161 Md. at 80. With respect to the purpose of the exception, the Court repeated the previously held view that admission of the complaint serves to rebut the inference that the victim consented. It also

13

observed, however, that because "secrecy and isolation" are the usual conditions in which sexual assaults are perpetrated, "some corroboration of the woman is important." *Id.*

Over time, the purpose of the exception changed from allowing the State to rebut the antiquated notions about women who do not promptly make a complaint of being sexually assaulted to allowing the State to offer "some corroboration" of the victim's testimony. *Parker v. State*, 156 Md. App. 252, 267 (2004) (explaining that "the purpose of the exception in Maryland is to corroborate the victim's testimony, and not simply to 'combat stereotypes held by jurors regarding nonreporting victims.'" (quoting and contrasting Maryland law with *State v. Samuels*, 75 Conn. App. 671, 729 (2003))). *See also Nelson v. State*, 137 Md. App. 402, 411 (2001) (observing that, due to the nature of the crime charged, the victim in a sexual assault prosecution often is in a "one-on-one credibility battle" with the accused.).

The purpose of the exception is fulfilled by allowing the State to introduce, in its case-in-chief, the basics of the complaint, *i.e.*, the time, date, crime, and identity of the perpetrator. The narrative details of the complaint are not admissible, as they exceed the limited corroborative scope of the exception. *Cole v. State*, 83 Md. App. 279, 294 (1990). *Cf. Tyler v. State,* 342 Md. 766, 779 (1996) (holding that witness's detailed hearsay statement was not admissible under the Rule 5-802.1(c) hearsay exception for a prior identification of the defendant because it "consisted of far more than a mere identification of [the defendant]"); *Mouzone v. State*, 294 Md. 692, 702 (1982) (holding that prior out-of-court statement of witness describing the suspect and also giving the details of the crime as she witnessed it

14

"contained much more than an identification and was thus beyond the scope of this exception."). The victim's out-of-court narrative detailing the sexual assault, offered to prove its truth, is a prior consistent statement, and therefore would be admissible substantively only if the criteria for that hearsay exception, set forth at Rule 5-802.1(b), were satisfied.[6]

Thus, in summary, the prompt complaint of sexual assault exception to the rule against hearsay

> is subject to limitations such as 1) the requirement that the victim actually testify; 2) the timeliness of the complaint; and 3) the extent to which the reference may be restricted to the fact that the complaint was made, the circumstances under which it was made, and the identification of the culprit, rather than recounting the substance of the complaint in full detail.

*Nelson*, 137 Md. App. at 411 (quoting *Cole*, 83 Md. App. at 289). Here, L.M. testified and the complaint to Detective Bell was timely made on the first day after the stabbing that L.M. was able to speak. The issue is whether Detective Bell's testimony, which related the narrative details of L.M.'s complaint, exceeded the scope of the prompt complaint of sexual assault exception to the rule against hearsay.

The State relies upon *Choate v. State*, 214 Md. App. 118 (2013), to argue that Detective Bell's testimony did not exceed the scope of the exception. There, the defendant

---

[6]Under the hearsay exception for a prior consistent statement, when a witness who testifies is expressly or impliedly accused of fabrication, the narrative details of the witness's prior consistent statement may be admitted for substantive use if the prior consistent statement was made before the motive to fabricate arose. *Thomas v. State,* 429 Md. 85, 101-02 (2012); *Holmes v. State*, 350 Md. 412, 422 (1998).

15

was a handyman the victim paid to do odd jobs around her house. One day he arrived earlier than expected, acted strangely, and then propositioned her. When she rejected his advances, he overpowered her, threatened her with a screwdriver, and forced her into an upstairs bedroom where he made her perform oral sex on him and attempted to rape her. In a ruse to escape, the victim offered to make him breakfast. He agreed and they went downstairs to the victim's kitchen, where she prepared scrambled eggs for him. She then walked out the front door of the house and to a gas station, where she called 911.

At trial, the court allowed the State to call the victim's sister to testify about a telephone call she received from the victim, as the victim's prompt complaint of sexual assault. The victim placed the call to her sister right after calling 911. The sister testified that the victim was "hysterical and said, 'Ralph [the defendant] raped me.'" *Id.* at 143. She continued:

> She [the victim] didn't sound like herself. She was crying. She was breathy. She wasn't able to talk to me in full sentences. I tried asking her where she was, and she just said, "The Exxon. The police are coming." And she couldn't get full sentences out. She asked me to call my cousin Lynn to come as well and meet her at the Exxon. Lynn is a detective, not in this county. And she just said, "Come here," and hung up. So it was very garbled and she was not making full sense.

*Id*. at 143-44.

The defendant was convicted of first-degree rape and two counts of first-degree sexual offense. On appeal, he argued that the trial court erred by not limiting the sister's testimony to the victim's statement, "Ralph raped me," and by not precluding the sister from giving

16

"other narrative details – such as the victim's statements that she was at the Exxon and the police were coming." *Id.* at 144. We disagreed, opining that the sister's testimony was "limited in scope" and "gave no substantive description of the assault." *Id*. at 148. We emphasized that most of the sister's testimony concerned the "circumstances under which the victim made the complaint" and that those "contextual statements were properly admitted as incidental to the victim's prompt complaint of sexual assault." *Id*. at 148-49.

The *Choate* case does not support the State's position in the case at bar. Unlike the sister's testimony in *Choate*, Detective Bell's testimony was not limited to the circumstances in which L.M. made her complaint of sexual assault to him or that L.M. had identified the appellant as the perpetrator and given the location, date, and time of the assault. Detective Bell recited L.M.'s "substantive description of the assault." He testified that L.M. told him that the appellant emerged from some bushes and approached her; that he identified himself as a member of BGF; that he put her in a "sleeper hold"; that he forced her into a vacant house; that he told her to "suck his dick"; that she tried to escape by biting his penis; that he beat her about the head; that she defended herself by scratching his face; that he pushed her to the ground and beat her more; and that she could not recall anything beyond that point in time until she woke up at Shock Trauma. These details corroborated much more than L.M.'s testimony that she was sexually assaulted by the appellant in a vacant row house on the afternoon of July 21, 2012. Indeed, they corroborated L.M.'s entire narrative of events, from the moment she encountered the appellant on the street to the moment she awoke at Shock

17

Trauma. Detective Bell's testimony about his interview with L.M. exceeded the bounds of a prompt complaint of sexual assault. It was an inadmissible prior consistent statement by L.M. The trial court erred in allowing Detective Bell to testify about L.M.'s narrative of the events surrounding the sexual assault.

The State does not concede error but argues that any error was harmless. To conclude that a trial court's error does not require reversal we must be able to declare, upon an independent review of the record, our belief, beyond a reasonable doubt, that the error did not influence the verdict. *Dionas v. State*, 436 Md. 97, 108 (2013); *Dorsey v. State*, 276 Md. 638, 659 (1976). We cannot do so in this case.

At trial, L.M. and the appellant gave completely different versions of the events surrounding the stabbing. According to L.M., the appellant forced her into the row house in a choke hold, which caused her to pass out; upon waking, she found the appellant on top of her forcing her to perform fellatio on him; she bit his penis and attempted to escape; and he retaliated by beating her repeatedly in the face. According to the appellant, he and L.M. agreed to an exchange of drugs for sex; she willingly accompanied him into the row house; he gave her crack cocaine and heroin, which she used; they undressed, and shortly thereafter an unknown intruder burst in and attacked them both; and L.M. accidently scratched him while attempting to fend off the assailant.

L.M. acknowledged that she was a drug addict at the time of the events, but her version of events did not include anything about her taking drugs. Items found in her purse

18

supported the appellant's testimony that he provided her drugs and that she used them. L.M. also did not testify to seeing a knife. The DNA evidence did not connect the appellant to the knife. Nor did it support L.M.'s testimony that she bit the appellant's penis.

To be sure, the appellant's version of events was rife with weaknesses. At the heart of the case was a credibility battle between him and L.M., however. Detective Bell's testimony about the details L.M. told him of her encounter with the appellant was an inadmissible prior consistent statement by L.M. that was likely to have bolstered her credibility in the eyes of the jurors. *See Thomas v. State*, 429 Md. at 111 (rejecting argument that prior consistent statement by witness was cumulative of his trial testimony, and therefore error in admitting it was harmless, because the consistency of the trial testimony and the prior statement "'is the very nature of the harm.'" (quoting *McCray v. State*, 122 Md. App. 598, 610 (1998))). Under the circumstances, we cannot say that the trial court's error in admitting Detective Bell's testimony did not influence the verdict in the case, beyond a reasonable doubt.

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**