*John Vigna v. State of Maryland*, No. 1327, September Term, 2017. Opinion by Nazarian, J.

**CRIMINAL LAW – CHARACTER EVIDENCE – CHARACTER OF ACCUSED**

In a child sex abuse case, the accused's reputation for appropriate interactions with children under their care is not a pertinent trait of character under Maryland Rule 5-404(a)(2)(A).

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1327

September Term, 2017
_____

JOHN VIGNA

v.

STATE OF MARYLAND
_____

Berger,
Nazarian,
Arthur,

JJ.
_____

Opinion by Nazarian, J.
_____

Filed: July 31, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

John Vigna was a long-time teacher at Cloverly Elementary, a public school in Montgomery County. In 2016, several students reported that Mr. Vigna had touched them inappropriately in his classroom, dating back as early as the 2001-2002 school year. Under the guise of a warm and affectionate teaching style, Mr. Vigna allegedly hugged female students and held them in his lap as he fondled their bodies through their clothing. He was tried in the Circuit Court for Montgomery County and, on June 9, 2017, convicted of one count of Child Abuse, three counts of Sex Abuse of a Minor, and five counts of Sex Offense in the Third Degree.

Mr. Vigna raises primarily evidentiary issues on appeal. *First*, he argues that the circuit court improperly excluded testimony (he describes it as character evidence) that Mr. Vigna had a reputation in the community for interacting appropriately with children under his care. *Second*, he argues that the circuit court improperly admitted reprimands he had received in previous school years for interacting inappropriately with students in the classroom. *Third*, he contends that the circuit court improperly admitted a school counselor's hearsay testimony relaying one victim's reports of her sexual abuse. And *finally*, he argues that the circuit court's evidentiary rulings violated his right to a fair trial under the Sixth Amendment to the U.S. Constitution. We disagree and affirm *in toto*.

## I. BACKGROUND

Mr. Vigna's career with the Montgomery County Public Schools ("MCPS") began in 1992 and ended when the investigation giving rise to this case led to his dismissal in 2016. During his time at MCPS, Mr. Vigna taught grades 3–5 at Cloverly Elementary and coached bocce and baseball at Paint Branch High School. He was widely adored as a

teacher and a colleague. He maintained close relationships with his students long after they left his class, and his colleagues praised his teaching style and entrusted him to look after their own students when they were unable to do so.

Despite his positive reputation, some of Mr. Vigna's colleagues expressed concern about how he interacted with students. Jennifer Grey,[1] a fifth-grade teacher, testified that she had seen Mr. Vigna with students in his lap "[a] handful of times" and had spoken with him more than once about maintaining appropriate boundaries with students. Ms. Grey reported cautioning Mr. Vigna "especially as a male teacher . . . [not to] be alone with female students one-on-one, and keep [his] distance." Ms. Grey testified that she did not believe there was anything sexual about Mr. Vigna's interactions with his students, but that it violated professional guidelines and the policies laid out in MCPS's pre-employment training.

In 2008, a fire marshal observed Mr. Vigna holding a child on his lap in his classroom. The fire marshal reported the incident to then-principal Melissa Brunson, who called Mr. Vigna into her office and gave him a verbal warning. Three months later, a building service worker saw Mr. Vigna with another child in his lap and was upset by what he saw. A loud disagreement ensued, and Mr. Vigna followed the service worker down the hall and "[tried] to explain that the child was upset and that [he] was trying to meet that child's need at that moment." The incident nonetheless was reported to Dr. Brunson, who

---

[1] Ms. Grey's name appears as both Grey and Gray in the record. When asked to spell her name for the record, she spelled it Grey.

this time gave Mr. Vigna an official written reprimand and a formal warning that he could be terminated if his behavior persisted. Despite the warning, Mr. Vigna acknowledged that he "continued to hug, to kiss, to have kids in [his] lap and to have that kind of contact with children" because "[t]hat was what [he] deemed [to be] an effective teaching style."

In 2013, MCPS conducted an investigation into Mr. Vigna's conduct in response to a parent complaint. This time, Mr. Vigna allegedly invited three "female students to sit on [his] lap, lift[ed] them in the air, and dance[d] with them during class." Mr. Vigna was placed on administrative leave for three weeks and received another written reprimand, this time from the Chief Operating Officer of MCPS. Mr. Vigna wrote a brief response promising to alter his behavior:

> I am going to restrict my activities in the classroom to strictly teaching, counseling and advising students and will make every effort to not have any physical contact at all with my students.

In 2016, A.C.[2] became the first of several victims to report that Mr. Vigna sexually abused her. Mr. Vigna was A.C.'s third-grade teacher during the 2013-2014 school year. When she was in fifth grade, the school counselor, Heather Sobieralski, conducted a lesson in personal body safety for A.C.'s class. The lesson included information about various forms of abuse and how children should get help if they were mistreated. The lesson included a definition of sexual abuse: "When someone touches you or asks you to touch them on the private parts of the body (those parts covered by a bathing suit), other than to keep you clean and/or healthy." Both Ms. Sobieralski and A.C.'s fifth grade teacher,

---

[2] To protect their privacy, we refer to Mr. Vigna's victims only by initials.

Ms. Grey, noted with concern that A.C.'s demeanor changed during the lesson. Although ordinarily an engaged classroom participant, A.C. became despondent during the body safety class; she slumped down in her chair and eventually laid her head on the desk. Later that day, when Ms. Grey and Ms. Sobieralski asked A.C. if she was okay, A.C. said "You know how we all love Mr. Vigna? Well, he touches us in ways that makes us feel uncomfortable."

A.C. reported that Mr. Vigna touches both her and her friend G.G. "on our butt, and [] makes us sit on his lap, and won't let us get up." In a later interview with a social worker, A.C. stated that Mr. Vigna's behavior had gone on for years. The first incident she could recall occurred during her second-grade year, and the most recent just a few days before the interview. She reiterated that Mr. Vigna touched her buttocks and made her sit on his lap. A.C. said that Mr. Vigna would pull her onto his lap by her hips and pull her back if she attempted to get up. She said that he rubbed her thighs with his hands and breathed steadily more and more heavily the longer she was held on his lap. When she was not on his lap, she said, his breathing was normal. A.C. also stated that when she was on Mr. Vigna's lap she could feel a "hard" part of his body, for which she did not have the vocabulary, "under her butt." When asked to locate the body part on an anatomical drawing, she circled the waistline.

Mr. Vigna ultimately was charged with sexual crimes against five of his former students. Each victim reported a similar pattern of behavior. All five victims were prepubescent girls at the time of the alleged incidents, and most testified to having felt that they had a special relationship with Mr. Vigna. Each child reported that Mr. Vigna touched

4

their chests, buttocks, and genitals through their clothing. Most of the incidents took place with other students in the classroom and had been concealed by strategic timing and placement. For example, Mr. Vigna often sat a child on his lap at his desk while the rest of his students watched videos at the front of the classroom. He also touched students at chaotic times, such as the end of the day, as the children prepared for dismissal.

Another victim, G.G., reported that she and A.C. frequently went to say goodbye to Mr. Vigna at the end of the school day. G.G. described the same pattern that A.C. reported. G.G. approached Mr. Vigna to say goodbye and give him a hug while he was seated at his desk. Mr. Vigna then rubbed her buttocks in a circular motion with one hand during a "side hug." She also reported that Mr. Vigna rubbed and squeezed A.C.'s buttocks before they left his classroom.

Two other victims, A.S. and J.S., are sisters. A.S. was in Mr. Vigna's third-grade class and reported that Mr. Vigna touched her weekly, if not more often, in ways that made her uncomfortable. She reported that he called her to the back of the classroom during the school day and touched her chest, buttocks, and genitals over her clothing. He also placed his hands on her stomach under her clothing. A.S. said that Mr. Vigna kissed her forehead and told her that he loved her and that she was beautiful while he held her on his lap.

J.S. was in Mr. Vigna's reading class. She, too, reported that Mr. Vigna would call her to the back of the classroom and, while hugging her, rub her buttocks and genitals through her clothing. She stated that "[i]n class he would call me over to the back table, just me and him, and then he would make sure I sat right next to him, and then he would start hugging me. He would start touching my butt."

5

L.D. was an adult at the time of trial. She was Mr. Vigna's student in fourth grade and stated that she was "very close with him;" she remembered "having a bond with him that [she] didn't have with other teachers." L.D. contacted the police after she saw an article on Facebook describing others' allegations against Mr. Vigna. She reported that Mr. Vigna sexually abused her during the 2001-2002 school year, and she recounted events similar to those alleged by the younger victims:

> [A]t the end of the day, while we're waiting for the buses, he would have me and my former classmate [], I would sit on one leg and . . . she would sit on the other leg, but it wasn't like Santa Claus style. It was like horseback ride style. So, I remember like we would lean back, and his hands would be on our, . . . like on our legs. And I remember one specific instance where he was talking to some boys across the desk, and every time he talked, I felt his finger on my crotch. And I remember this so well, even though it was so many years ago, because I felt sexually aroused when that happened. I felt like that tingly sensation, and that's when I knew something wasn't right.

L.D. described "a routine" for Mr. Vigna's class, in which she "ha[d] to give him a kiss on the cheek every single day before we left to go ride our bus." She also said that on one occasion, Mr. Vigna instructed her to change her clothes in a closet in his classroom with the door ajar and that she felt very uncomfortable.

All five victims testified at trial, as did several of Mr. Vigna's former colleagues, including Ms. Sobieralski, Ms. Grey, and Dr. Brunson. Mr. Vigna also testified in his own defense, and he denied categorically that he ever touched a student for his sexual gratification. He testified that touching children inappropriately was "simply against the fiber of [him]." He did not deny that he often hugged children, had them sit on his lap, kissed them, and told them that he loved them:

6

MR. VIGNA: I told all of my students that I loved them. I believe that you had to love them to lead them and if they knew that then they would follow you to new heights academically and socially.

MR. VIGNA'S COUNSEL: There has been testimony that on occasion you kissed a student on the forehead or on the top of the head or a student kissed you on the cheek. Did that ever happen?

MR. VIGNA: Yes, I would go back and blame that on my Italian family.

MR. VIGNA'S COUNSEL: And did any of those incidents about which we have just been speaking did that involve any attempt to sexually exploit any of the students in your class?

MR. VIGNA: Absolutely not.

Mr. Vigna attributed much of his behavior to growing up in a large Italian family that emphasized physical affection. He said he viewed his students as his family and would not want to carry on teaching if he could not show them love and physical affection. Mr. Vigna also acknowledged that he had failed to comply with his agreement not to have physical contact with his students, and stated repeatedly that the students initiated[3] the hugs and lap-sitting. "[T]hey are little kids," he explained, "[s]o you can try and tell them not to sit on your lap but . . . they are going to come up and hop on your knee whether you want them to or not." He attributed any contact that could have been interpreted as sexual to accidental touching in the daily classroom scuffle.

The jury convicted Mr. Vigna of nine of the fourteen counts charged. He later was sentenced to eighty years in prison, all but forty-eight suspended. Additional facts will be

---

[3] Several of his victims testified to the contrary that Mr. Vigna would ask for hugs and tell his students to "come here" before pulling them into his lap.

provided below as needed.

## II. DISCUSSION

Mr. Vigna challenges three of the circuit court's evidentiary rulings on appeal. He contends *first* that the trial court erred when it excluded, under Maryland Rule 5-404(a)(2)(A), evidence of his character, specifically his character for interacting appropriately with children. *Second*, he argues that his 2008 and 2013 reprimands for inappropriate physical contact with his students were improperly admitted as prior bad acts evidence under Maryland Rule 5-404(b). *Third*, he argues that the trial court improperly admitted A.C.'s complaint to Ms. Sobieralski under Maryland Rule 5-802.1(d). And he argues *finally* that the circuit court's decisions to admit his prior reprimands while excluding his proffered character evidence violated his right to a fair trial under the Sixth Amendment to the United States Constitution.[4] We find that the circuit court properly exercised its discretion throughout the trial and affirm Mr. Vigna's convictions.

### A. "Appropriate Interaction With Children" Is Not A Pertinent Character Trait Under Maryland Rule 5-404(a)(2)(A).

We begin with Mr. Vigna's argument that the circuit court erred when it excluded defense testimony about his reputation in the community for "appropriate interaction with students in his care and custody." Mr. Vigna sought to admit this testimony under Maryland Rule 5-404(a)(2)(A), which allows defendants in criminal cases to offer evidence of their "pertinent trait[s] of character." The trial judge permitted Mr. Vigna's character witnesses

---

[4] Mr. Vigna also asserts that the circuit court's decisions violated his right to a fair trial under the Maryland Declaration of Rights. Mr. Vigna does not develop an independent argument on this theory and we decline to address it.

to testify to his truthful and law-abiding nature, but found that interacting appropriately with the children under his care was not a pertinent character trait within the meaning of the Rule. We review this question of statutory interpretation *de novo.*

Generally, "evidence of a person's character or character trait is not admissible to prove that the person acted in accordance with the character or trait on a particular occasion." Md. Rule 5-404(a). Rule 5-404(a)(2)(A) is an exception to the general prohibition on propensity character evidence that applies in criminal cases:

> An accused may offer evidence of the accused's pertinent trait of character. If the evidence is admitted, the prosecution may offer evidence to rebut it.

Md. Rule 5-404(a)(2)(A).

The scope of what constitutes a "pertinent character trait" under Rule 5-404(a)(2)(A) is defined by the nature of the crimes alleged. To be admissible, the evidence must be "confined to an attribute or trait the existence or non-existence of which would be involved in the noncommission or commission of the particular crime charged." *Braxton v. State*, 11 Md. App. 435, 440 (1971). In other words, pertinent character traits must be relevant to the specific crimes charged—they must have some bearing on the likelihood that a person exhibiting that trait would (or would not) commit the crimes of which he stands accused. The issue before us, therefore, is whether Mr. Vigna's reputation in the community for appropriately interacting with children bears on whether he sexually abused them. We agree with the circuit court that it does not.

This narrow issue is one of first impression in Maryland. Mr. Vigna relies primarily on *State v. Rothwell*, a decision from the Court of Appeals of Idaho that held that "character

9

traits relating to a defendant's sexual morality with children are pertinent" in a case involving sexual misconduct with a minor under Idaho Rule 404(a)(2)(A).[5] 154 Idaho 125, 131 (Ct. App. 2013). The court found the evidence relevant, albeit limited in probative value, and Mr. Vigna urges us to adopt its reasoning:

> Because character traits relating to a defendant's sexual morality with children are pertinent, or relevant, in this type of case, such evidence is admissible under I.R.E 404(a)(1). We recognize that sexual abuse is usually secret behavior that would not be observed by others, and therefore the opinion or reputation evidence about a defendant's trustworthiness with children may be of marginal persuasiveness. . . . It appears that Rule 404(a)(1) was nevertheless intended to allow an accused the opportunity to present evidence of good character that is pertinent to the nature of the charged offense. The unlikelihood that the character witnesses would have been in a position to witness criminal conduct of the defendant goes to the weight of character evidence, not its admissibility.

*Id.* at 131.

The majority of jurisdictions that have considered this general question have concluded, as Idaho did, that a defendant's interactions with children, sexual predispositions, and general "morality" are pertinent character traits in child sex abuse cases. *See e.g.*, *People v. McAlpin*, 53 Cal.3d 1289, 1309 (1991) (witnesses should have been permitted to testify that the defendant was "not a person given to lewd conduct with children"); *State v. Rhodes*, 219 Ariz. 476, 479 (App. 2008) (the defendant's "sexual normalcy, or appropriateness in interacting with children" was a pertinent trait); *State v. Hughes*, 841 So.2d 718, 723 (La. 2003) ("a defendant may present evidence of his or her

---

[5] Idaho Rule of Evidence 404(a) is virtually identical Maryland Rule 5-404(a).

reputation in the community as a moral person and for safe and proper treatment of young children . . ."); *State v. Enakiev*, 175 Or.App. 589, 596 (2001) (evidence of a defendant's "sexual propriety" is admissible as a pertinent trait in a prosecution for a sex crime). Those jurisdictions make no distinction between the traits for sexual propriety or appropriateness with children and more traditional traits offered as character evidence such as honesty or peacefulness. And like Idaho, they reason that the limited probative value of the evidence goes only to its weight, not to its admissibility. *See Rhodes*, 219 Ariz. at 479.

Mr. Vigna asks us to take this principle a step further, and essentially tries to cast the ultimate issue in this case—whether he acted in a sexually inappropriate manner around children—as a character trait. We don't dispute that reputation testimony about a pertinent character trait is admissible even when its probative value is limited. But evidence can be admitted for a jury's assessment of weight and credibility only after a threshold finding that the proffered trait is relevant. And we are not convinced that a defendant's reputation in the community for interacting appropriately with children is relevant in a child sex abuse case.

Unlike honesty or peacefulness, traits a person might exhibit visibly day-to-day, sexual interests, predilections, or deviancy are not readily discernable to a casual observer, or even a close colleague. For that reason, courts in other states have disagreed with the majority view and have found reputation evidence relating to sexual behavior irrelevant to a defendant's guilt for sexual crimes involving children. Put another way, the fact that a defendant might have behaved appropriately with children in some instances does not make

11

it more or less likely that the defendant sexually abused a child.[6]

In *State v. Jackson*, the Court of Appeals of Washington held that because of the secretive nature of sexual crimes, and sexual activity in general, a defendant's reputation for sexual activity, or the lack thereof, bore no correlation to the likelihood that they committed the crimes charged:

> The crimes of indecent liberties and incest concern sexual activity, which is normally an intimate, private affair not known to the community. One's reputation for sexual activity, or lack thereof, may have no correlation to one's actual sexual conduct. Simply put, one's reputation for moral decency is not pertinent to whether one has committed indecent liberties or incest.

46 Wash.App. 360, 365 (1986). Florida courts have likewise found that a defendant's reputation for sexual morality did not bear on the likelihood that he committed a sexual crime against a child. If anything, the District Court of Appeal of Florida observed, that sort of testimony is inherently unreliable:

> [T]he court was concerned with the reliability of such reputations given that sexual conduct of the nature alleged here normally does not occur in public. Implicit in the court's analysis is the conclusion that reputations for truthfulness, peacefulness, etc. are more reliable and less likely to differ from reality because those traits are commonly displayed in public. . . . In addition, it is highly unlikely that a person will discuss his or her immoral or indecent sexual conduct;

---

[6] North Carolina has also concluded that this kind of character evidence is not pertinent under the Rules of Evidence, but for slightly different reasons. *See State v. Clapp*, 235 N.C.App. 351, 363 (2014) ("[T]he evidence at issue in this case, which consisted of testimony . . . to the effect that [the witness] saw no indication that Defendant had an unnatural lust for or sexual interest in young girls, constituted nothing more than an attestation to Defendant's normalcy. As a result, given that the excluded evidence did not tend to show the existence or nonexistence of a pertinent trait of character, the trial court did not err by excluding [the] testimony[.]").

therefore, a person's reputation for sexual conduct is not likely to reflect immoral or indecent conduct.

*Hendricks v. State*, 34 So.3d 819, 824 (Fla. 1st DCA 2010) (quoting *State v. Spencer*, 84 Wash.App. 1010 (1996) (unreported), No. 35276-8-I, 1996 WL 665931); *see also Alvelo v. State*, 769 So.2d 476 (Fla. 5th DCA 2000). And New Hampshire reached a similar conclusion, finding in *State v. Graf* that because sexual crimes are undertaken furtively, character witnesses necessarily lack the required foundation to "form an opinion as to whether the defendant is the type of person to sexually assault or to take advantage of children." 143 N.H. 294, 299 (1999). The court couched its conclusion in relevance terms: "Accordingly, the proffered evidence, lacking any foundation, would be irrelevant because it does not have the tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Id.*

We join those courts that have declined to extend the general rule allowing character and reputation evidence to include more granular testimony about a defendant's reputation for sexual propriety or appropriateness with children. We agree with our Floridian counterparts that testimony from colleagues that Mr. Vigna hadn't acted inappropriately with children in their presence "is not the kind of evidence contemplated by character testimony. Unlike one's reputation for honesty or peacefulness, traits that might be noticed by the community, whether one secretly molests children or does not would not be openly exhibited[.]" *Alvelo*, 769 So.2d at 477. And we find those cases particularly compelling in

13

light of the growing understanding about adults who sexually abuse children and the tactics they employ to gain access to their victims.

Sexual predators are "not instantly recognizable as the 'dirty old man in the raincoat.'" Anne-Marie McAlinden, *Setting 'Em Up: Personal, Familial, and Institutional Grooming in the Sexual Abuse of Children*, 15 SOC. AND LEGAL STUD. 339, 348 (2006). They blend into the community and often stand in trust relationships—coaches, clergy, teachers, physicians, or family members—with their victims. *Id.* Offenders "groom" victims through these relationships and "skillfully manipulate a child into a situation where he or she can be more readily sexually abused and is simultaneously less likely to disclose." *Id.* at 346.[7] Recent news accounts demonstrate how offenders exploit trust relationships, not only with children but also their parents and the community at large, to gain access to victims.[8] Before these allegations became public, there undoubtedly were colleagues,

---

[7] The U.S. Department of Justice, Office of Sex Offender Sentencing, Monitoring, Apprehension, Registering, and Tracking uses the following definition of grooming:

> Grooming is a method of building trust with a child and the adults around a child in an effort to gain access to and time alone with her/him. . . . The offender may assume a caring role, befriend the child or even exploit their position of trust and authority to groom the child and/or the child's family.

U.S. Dep't of Justice, National Sex Offender Public Website, SMART Program. "Get Answers About Sexual Abuse and Associated Risks: Common Questions." Available at https://perma.cc/56RY-7J38.

[8] Consider a few recent and infamous examples: (1) Larry Nassar, the former U.S. Gymnastics national team doctor sentenced to nearly two centuries in prison for sexually abusing his patients—one of his victims had known him her entire life and was sexually abused starting at age ten by the doctor who was "almost like family," *see, e.g.*, Dan Barry, Serge F. Kovaleski and Juliet Macur, *As F.B.I. Took a Year to Pursue the Nassar Case, Dozens Say They Were Molested*, N.Y. TIMES, Feb. 4, 2018 at A1; (2) Jerry Sandusky, the former assistant football coach at Penn State who met his victims through a charity he

parents, and other children who could have testified honestly that they believed those abusers were appropriate with children and much beloved by the community for the strong relationships they formed with them.

To admit a community member's opinion about a defendant's reputation for propriety with children would fail to "consider that sex offenders may [] groom not just the child but also their family or the wider community as a necessary prerequisite to gaining access" to child victims. *Id.* at 341. In this way, they "ingratiate themselves with children and infiltrate themselves into unsuspecting . . . communities. . . . To do this successfully, they must pass themselves off as being very nice, usually, men who simply like children." *Id.* at 348. This is not to suggest that teachers, clergy, or other adults with close relationships with children should inherently be regarded with suspicion, or that their close relationships with children suggest *impropriety* with children. But an adult's public interaction with children under his care doesn't make it any more or less likely that the

_____

founded ostensibly to help at-risk youth, *see, e.g.*, Mark Viera, *Former Coach at Penn State Is Charged With Abuse*, N.Y. TIMES, Nov. 6, 2011 at A1; and (3) the thousands of children victimized by clergy. *See, e.g.*, Isaac Stanley-Becker, *'He's a priest. I trusted him': One of the 1,000 victims of the alleged Pennsylvania clergy abuse tells his story*, WASH. POST, Aug. 15, 2018 ("the priest physically and emotionally abused [the victim], 'grooming' him by exploiting the intensity of their bond."); Michael Rezendes *et al.*, *Church allowed abuse by priest for years: Aware of Geoghan record, archdiocese still shuttled him from parish to parish*, BOS. GLOBE, Jan. 6, 2002 ("The affable Geoghan usually befriended Catholic mothers struggling to raise large families, often alone. His offers to help . . . were accepted without suspicion."); Elizabeth Dias, *Her Evangelical Megachurch Was Her World. Then Her Daughter Said She Was Molested by a Minister*, N.Y. TIMES, June 10, 2019; Hannah Dreyfus, *Did Baltimore's Orthodox Community Turn A Blind Eye To Child Sexual Abuse? Despite allegations against him, popular rabbi was still working with children—until Jan. 2018*, THE NEW YORK JEWISH WEEK, Jan. 17, 2018.

alleged victims were abused by him privately. And because it's not relevant, it's not admissible under Rule 5-404(a)(2)(A).

Mr. Vigna counters that his victims allege they were abused in public and that the reputation evidence he seeks to admit is therefore appropriate. But although it is true that much of the reported abuse took place in his classroom, with other students in the room, the victims explained that Mr. Vigna took active steps to avoid detection. His victims were abused most frequently during the chaos of the classroom at dismissal time, or during showings of videos when the room was darkened and other students' attention was distracted.

Ultimately, very little of the testimony that Mr. Vigna offered did not find its way to the jury. He called nine defense witnesses who testified that he was law-abiding and truthful. Four were former colleagues, and two worked in Mr. Vigna's classroom alongside him. One character witness, who was both a former colleague and the parent of a former student, testified that she trusted Mr. Vigna "obviously, with the lives of [her] children" and that "as a coworker, I trust him helping me out of some very difficult situations with other children. So [] he's very trustworthy and . . . very calming to the children that I needed help with." Another stated that he would trust Mr. Vigna with his life. Mr. Vigna's twelve-year-old niece testified that she trusted her uncle. And despite excluding testimony about Mr. Vigna's reputation for interacting appropriately with children, the court allowed multiple parents to testify about the positive experience of having Mr. Vigna teach their children. He was not permitted to elicit testimony that he had the reputation for conducting himself appropriately with children, but the extensive testimony he did elicit supports the

16

"trait" that Mr. Vigna sought to establish. We see no error in the circuit court's decision to exclude Mr. Vigna's proffered character evidence.

### B. The Circuit Court Properly Admitted Mr. Vigna's Prior Reprimands.

*Second*, Mr. Vigna argues that the trial court abused its discretion by admitting, via Maryland Rule 5-404(b), reprimands he received from school administration in the past for inappropriate interactions with his students. The circuit court admitted two disciplinary letters, one from 2008 and one from 2013. The 2008 reprimand from Dr. Brunson described two incidents involving students on Mr. Vigna's lap:

> This letter is an official reprimand for inappropriate behavior and failure to exercise the professional judgment expected of a [MCPS] employee. . . . On Thursday, February 28, 2008, a public service worker observed a male[9] student sitting on your lap. As follow-up, you and I met on Friday, February 29, 2008, where you admitted to your wrongdoing and you received immediate counseling by me and a verbal warning not to have any students sit on your lap at any time. Again on Thursday, May 30, 2008 another student, this time a female student, was sitting on your lap. . . . [T]his investigation reveals that you have demonstrated insubordination on your part. Your handling of this situation was improper, unprofessional, and must not be repeated.

The second reprimand came five years later from Larry A. Bowers, the COO of MCPS, and also arose after Mr. Vigna was seen with students on his lap and dancing with them:

> The purpose of this letter is to strongly reprimand you for insubordination and failure to exercise the professional judgment expected of a [MCPS] employee. . . . [The Office of Human Resources and Development] investigated the allegation that you had invited female students to sit on your

---

[9] There was some dispute at trial regarding the gender of this student. Although the letter indicates Mr. Vigna had a male student in his lap, Dr. Brunson testified that she believed that was a typo and the student was, in fact, female.

lap, lift them in the air, and dance with them during class. These behaviors are indefensible, inappropriate, and intolerable. . . . It is difficult to believe that any teacher, especially a veteran teacher, would not understand what is respectful and professional behavior . . . . This is to serve as a warning that you need to alter your interactions with students immediately. Any further instances of such unprofessional behavior may be grounds for more severe disciplinary action up to and including dismissal.

The circuit court admitted Mr. Vigna's reprimands under Rule 5-404(b). The court found that they were admissible for the purposes of demonstrating Mr. Vigna's intent, knowledge of his wrongdoing, and absence of mistake:[10]

So what this shows is within seven months after being reprimanded and writing a letter saying he'll have no contact with his students, we have victims . . . talking about conducting in the same type of activity, which is sitting on the lap and now inappropriate touching. So I think under 404(B) parameters, although the prior acts [] themselves may not have been crimes independently, they certainly were acts that were determined to be inappropriate by school officials and he was given warning that it was inappropriate for the teacher to have any physical contact with students which he acknowledged and indicated that he would not do that in the future. So I think that the areas of special relevance of these activities from 2008 and 2013 certainly go to knowledge. It goes to the defendant's knowledge that this conduct was inappropriate, even at a school disciplinary level, much less criminal activity. It also I think goes to intent, which indicates he intended to never have any physical contact, knowing that it was inappropriate. . . . It also goes to the issue of lack of mistake or accident[.]

Mr. Vigna contends that the reprimands should not have come in because they did not indicate that he had engaged in prior *criminal* behavior, "because the evidence was not

---

[10] The circuit court did not admit all the evidence the State sought to admit. The court admitted Mr. Vigna's prior reprimands, but excluded evidence that students had been seen in the area behind his desk after concluding it was not relevant to the crimes charged.

substantially related to some contested issue in the case," and because the reprimands' prejudicial effect outweighed their probative value. We disagree.

Maryland Rule 5-404(b) governs "other crimes" or "prior bad acts" evidence:

> Evidence of other crimes, wrongs, or acts . . . is not admissible to prove the character of a person in order to show action in conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Trial courts analyze proposed prior bad acts evidence using a three-part test. *State v. Faulkner*, 314 Md. 630, 634 (1989). The court must determine first whether the proffered evidence fits into one of the Rule's exceptions. *Id.* We review that decision *de novo*. *Behrel v. State*, 151 Md. App. 64, 125 (2003). The court then must assess "whether the accused's involvement in the other crimes is established by clear and convincing evidence." *Faulkner*, 314 Md. at 634. Finally, the trial court must weigh "[t]he necessity for and probative value of the 'other crimes' evidence . . . against any undue prejudice likely to result from its admission." *Id.* at 635. We review the circuit court's balancing of probative value against undue prejudice for abuse of discretion. *Smith v. State*, 218 Md. App. 689, 710 (2014).

Mr. Vigna's reprimands were not offered to show that he acted in conformity with his prior bad behavior with his students. The State offered them instead to show that Mr. Vigna had been on notice that his actions were wrongful. His primary defense at trial was that he intentionally cultivated a family-like environment in his classroom where physical affection was common. The prior reprimands demonstrated that, whatever his

claimed intentions, he was on notice that his behavior was "indefensible, inappropriate, and intolerable," but that he persisted in that behavior at least until 2013 when, he claims, he made "the very conscious effort to change [his] teaching style" after a three-week suspension. For that reason, Mr. Vigna's prior reprimands are "substantially relevant to some contested issue in the case," and the trial judge properly found they fell under Rule 404(b) special relevance. *Merzbacher v. State*, 346 Md. 391, 407 (1997).

We similarly see no merit in Mr. Vigna's arguments that the reprimands were inadmissible because they didn't involve criminal behavior. It's true that evidence admitted under Rule 5-404(b) is often called "other crimes evidence." *See, e.g.*, *Behrel*, 151 Md. App. at 124. But the Rule is not limited to prior criminal behavior. The plain language of the Rule encompasses "crimes, wrongs, or acts." "A bad act is an activity or conduct, *not necessarily criminal*, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit." *Brice v. State*, 225 Md. App. 666, 692 (2015) (cleaned up) (emphasis added). And in determining what may properly be admitted, courts look at the nature of the activity as it relates to the crime charged, not whether the activity independently constitutes a crime. *See Klauenberg v. State*, 355 Md. 528, 549 (1999) (*quoting U.S. v. Cooper*, 577 F.2d 1079 (6th Cir.), *cert. denied*, 439 U.S. 868 (1978)) ("Conceivably within the broad language of the rule is any conduct of the defendant which may bear adversely on the jury's judgment of his character.").

Finally, we consider and reject Mr. Vigna's argument that the probative value of his prior reprimands was outweighed substantially by the risk of unfair prejudice. Mr. Vigna claims that admitting his prior reprimands "had the very real effect of casting [him] as a

dirty man who had children sit in his lap." But Mr. Vigna readily admits both in appellate briefing[11] and in his trial testimony[12] that he had children sit in his lap. And his prior reprimands do not characterize his behavior towards the children as sexual, but as unprofessional and inappropriate. Moreover, the concern with prior bad acts evidence is not avoiding any and all prejudice, but avoiding "untoward prejudice" or "unfair prejudice" that creates the risk that the jury will convict the defendant for reasons unrelated to his commission of the crimes charged. *Faulkner*, 314 Md. at 641 (*quoting Cross v. State*, 282 Md. 468, 474 (1978)). In light of Mr. Vigna's ready acknowledgment that he had his students sit in his lap, we fail to see how the prior reprimands created a risk of unfair prejudice that outweighed their probative value substantially, and thus we see no abuse of the circuit court's discretion in admitting them.

### C. Ms. Sobieralski's Testimony Is Admissible Under The Prompt Complaint Exception To The General Prohibition On Hearsay.

Mr. Vigna argues *next* that the circuit court erred by admitting A.C.'s statements to Ms. Sobieralski under Maryland Rule 5-802.1(d), which excepts from the general prohibition on hearsay a "prompt complaint of sexually assaultive behavior to which the declarant was subjected." Mr. Vigna contends that A.C.'s complaint was not made promptly and that Ms. Sobieralski's testimony extended beyond the scope allowable under

---

[11] "There was no need to make an argument of lack of intent or mistake in 5-404(B) because Mr. Vigna never denied that the students sat on his lap."

[12] "Well, first of all elementary education they are little kids. So you can try and tell them not to sit on your lap but if they are affectionate to you and they have feelings towards you and they feel like they can count on you they are going to come up and hop up on your knee whether you want them to or not. So it happened with some frequency."

21

the Rule. We review *de novo* the circuit court's determination of whether evidence is admissible under a hearsay exception. *Gordon v. State*, 431 Md. 527, 538 (2013).

Maryland Rule 5-801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is presumptively inadmissible unless it falls under one of the recognized hearsay exceptions. Md. Rule 5-802; *Parker v. State*, 156 Md. App. 252, 259 (2004). The circuit court admitted Ms. Sobieralski's statement under Md. Rule 5-802.1(d), the "prompt complaint" exception:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> \*\*\*
>
> (d) A statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony[.]

There is no dispute that A.C. testified at trial and was subject to cross-examination about her statement to Ms. Sobieralski. Mr. Vigna complains, however, that her statement came too long after her alleged abuse to be considered "prompt." We disagree.

Promptness in this context is not subject to any "immutable time frame." *Gaerian v. State*, 159 Md. App. 527, 541 (2013). To the contrary, "promptness is a flexible concept, tied to the circumstances of the particular case." *Id.* at 540. A complaint of sexual assault may be considered prompt if the victim's statement is made "without a delay which is unexplained or is inconsistent with the occurrence of the offense." *Harmony v. State*, 88 Md. App. 306, 321 (1991) (cleaned up). And in making that determination, we take into

22

account "what a reasonable victim, considering age and family involvement and other circumstances, would probably do by way of complaining once it became safe and feasible to do so." *Nelson v. State*, 137 Md. App. 402, 418 (2001). When the complainant is a young child, as in this case, the time analysis can include factors related to "the natural fear, ignorance, and susceptibility to intimidation that is unique to a young child's make-up" including "the relationship between the complainant and the defendant" and "whether the defendant held a position of trust in the complainant's life." *Gaerian*, 159 Md. App. at 542 (*quoting Commonwealth v. Fleury*, 417 Mass. 810 (1994)).

Until Ms. Sobieralski's body safety class, A.C. didn't understand that Mr. Vigna's behavior toward her was sexually abusive. As soon as she understood that Mr. Vigna had touched her inappropriately, she became upset and told her teacher and school counselor about what had happened. The delay between the onset of the abuse and A.C.'s complaint is explained readily by A.C.'s young age and close and trusting relationship with Mr. Vigna. And although we know that Mr. Vigna's abuse of A.C. spanned a period of years, "[n]owhere in any case of which we are aware does the applicability of Rule 5-802.1(d) . . . hinge upon the victim reporting the *first* act of abuse." *Gaerian*, 159 Md. App. at 538. (cleaned up). We agree with the circuit court that A.C.'s complaint was prompt within the meaning of Rule 5-802.1.

Mr. Vigna claims as well that Ms. Sobieralski's testimony exceeded the scope of what Rule 5-802.1(d) allows. The "legally sanctioned function" of the prompt complaint exception is to bolster the credibility of the victim by corroborating her account of the alleged assault. *Choate v. State*, 214 Md. App. 118, 146 (2013) (*quoting Nelson*, 137 Md.

23

App. at 411). But we have found that testimony admitted under the prompt complaint exception is subject to certain limitations, including "the extent to which the reference may be restricted to the fact that the complaint was made, the circumstances under which it was made, and the identification of the culprit, rather than recounting the substance of the complaint in full detail." *Muhammad v. State*, 223 Md. App. 255, 269 (2015) (*quoting Nelson*, 137 Md. App. at 411). That said, "[a]lthough the earlier case law admitted only the bare fact that the complaint had been made, the restraints have been loosened at least to the point of admitting as well the essential nature of the crime complained of and the identity of the assailant." *Cole v. State*, 83 Md. App. 279, 293 (1990).

Ms. Sobieralski simply recounted what A.S. told her:

> Ms. Grey walked in and said, [A], please tell Ms. S. what you told me. And she said, you know how everybody loves--this is [A] talking. You know how everybody loves Mr. Vigna? I said, yes. And she said, well he makes me feel uncomfortable. And I said, how so? And she said, when he hugs me he touches my butt. And he makes me sit on his lap, and when I try to get up he doesn't let me.
>
> ***
>
> I asked where and when this was happening. And she said when she goes to say goodbye at the end of the day. I asked if anybody else was involved and she said another student[']s name.

That was the full extent of Ms. Sobieralski's testimony on the content of A.C.'s complaint, and it fell well within the limitations to the prompt complaint exception. Ms. Sobieralski's testimony provided the context of the complaint, identified Mr. Vigna as the culprit, and stated the nature of the allegations. It did not, as Mr. Vigna claims, include a

24

narrative account of A.C.'s abuses at Mr. Vigna's hands. The circuit court properly admitted Ms. Sobieralski's testimony about A.C.'s prompt complaint.

**D. Mr. Vigna Received a Fair Trial Under the Sixth Amendment to the U.S. Constitution.**

*Finally*, Mr. Vigna argues that the circuit court's decisions to exclude his proffered character testimony and admit his prior reprimands violated his right to a fair trial under the Sixth Amendment to the United States Constitution. Mr. Vigna's constitutional arguments do not differ meaningfully in their substance from his evidentiary arguments. He argues that the court's admission of his prior reprimands coupled with the exclusion of his character witnesses' testimony that he interacted appropriately with students was so prejudicial that it denied him a fair trial. He claims that the court's decisions "set an impossibly unfair playing field at trial" and that the State "made [his trial] into a personality contest and [Mr.] Vigna was not allowed to present meaningful relevant evidence in his defense."

We disagree. As a general rule, Maryland appellate courts "will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground." *Myer v. State*, 403 Md. 463, 475 (2008). Mr. Vigna nonetheless reminds us that "[t]he Constitution, not the Rules of Evidence, [r]eign [s]upreme[,]" and that "[w]hen push comes to shove, the right to a fair trial wins over evidentiary constraints." But Mr. Vigna was not deprived of his right to a fair trial—he was not prevented from putting on witnesses in his defense, only from allowing them to present irrelevant testimony that, in their opinion, he behaves appropriately with the children under his care. Furthermore, as

25

discussed in Section A above, most of what Mr. Vigna sought to admit reached the jury despite the circuit court's ruling.[13] We find that Mr. Vigna was not deprived of his right to a fair trial under the Sixth Amendment and affirm his convictions accordingly.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**

---

[13] Mr. Vigna does not articulate a separate constitutional argument against the admission of his prior reprimands under Rule 5-404(b). But whatever his theory may be, the circuit court could not possibly have admitted his proffered character testimony while excluding his prior reprimands. If the circuit court were to have admitted his desired character testimony, that necessarily would have opened the door for the State to rebut that character testimony with specific conduct indicating that he did not, in fact, behave appropriately with children, which would bring Mr. Vigna's prior reprimands under that umbrella.