*Sheldon Lyvonne Curtis v. State of Maryland*

No. 455, Sept. Term 2022

Opinion by Leahy, J.


**Evidence > Maryland Rule 5-803(b)(4) > Statements for Purposes of Treatment or Diagnosis > Identification of Perpetrator**


The trial court did not err in finding that victim's statement to her emergency care physician that she was assaulted by her boyfriend qualified as a statement made for purposes of medical treatment or diagnosis under Maryland Rule 5-803(b)(4) where: (1) the victim made the statement within a few hours of the assault in a health care setting, while she was still suffering from her injuries, in response to a medical provider who asked her "what happened"; and (2) the statement described the external cause of the victim's symptoms and was reasonably pertinent to the treatment of her injuries as a victim of intimate partner violence.


**Evidence > Maryland Rule 5-803(b)(2) > Excited Utterance > Continuing Stress of Startling Event**


The trial court did not err in admitting victim's statement as an excited utterance under Maryland Rule 503(b)(2) because the victim's frenzied demeanor, her palpable fear of continuing and imminent danger, and her pleas for help constituted a sufficient foundation for the court to find that she was still "under the stress of excitement caused by" a startling event when she told her neighbor that she was afraid of her boyfriend.

Circuit Court for St. Mary's County
Case No. C-18-CR-21-000004

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 455

September Term, 2022

_____

SHELDON CURTIS

v.

STATE OF MARYLAND

_____

Leahy,
Beachley,
Moylan, Charles E.
     (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: October 24, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

On a cold December night in 2020, Ms. Sarah Hockaday ran out of her apartment barefoot and crying. She ran over to her neighbor, Ms. Day, who was smoking a cigarette in the parking lot, and then ran into Ms. Day's apartment where she told Ms. Day that she was afraid of her boyfriend. That safe haven did not hold firm because Ms. Hockaday's boyfriend got into the neighbor's apartment where he beat and strangled her. After emergency medical personnel transported Ms. Hockaday to MedStar St. Mary's Hospital, the emergency care physician asked Ms. Hockaday "what happened to her." Ms. Hockaday related, in response to the doctor's inquiry, that "she was assaulted by her boyfriend multiple times" and experienced "an episode of loss of consciousness" which lasted approximately two minutes.

On January 4, 2021, the State filed a criminal indictment against Ms. Hockaday's boyfriend, Mr. Sheldon Lyvonne Curtis ("Appellant").

Appellant was tried before a jury in October 2021 in the Circuit Court for St. Mary's County, Maryland. The jury acquitted him of attempted second-degree murder but convicted him on two counts of first-degree assault of Ms. Hockaday. At the sentencing hearing on May 12, 2022, the circuit court merged Appellant's convictions for first-degree assault and imposed a sentence of twenty-five years, with twelve years suspended.

Appellant noted a timely appeal and claims the trial court's admission of two hearsay statements over defense counsel's objections constituted reversible error. He frames the issues as follows:

1. "Did the lower court err in admitting a statement which identified not the cause of the injury, but the perpetrator, pursuant to the hearsay exception for statements made for the purposes of medical treatment or diagnosis?"

1

2. "Did the lower court err in admitting an excited utterance where the declaration was made an unknown amount of time after the startling event, away from the scene of the incident?"

We discern no error or abuse of discretion in the trial court's admission of Ms. Hockaday's statements through the testimony of the emergency care physician and her neighbor. First, we hold that Ms. Hockaday's statement to her emergency care physician that she was assaulted by her boyfriend qualified as a statement made for purposes of medical treatment or diagnosis under Maryland Rule 5-803(b)(4) where: (1) Ms. Hockaday made the statement within a few hours of the assault in a health care setting, while she was still suffering from her injuries, in response to a medical provider who asked her "what happened"; and (2) the statement described the external cause of Ms. Hockaday's symptoms and was reasonably pertinent to the treatment of her injuries as a victim of intimate partner violence.

Second, we hold that Ms. Hockaday's frenzied demeanor, her palpable fear of continuing and imminent danger, and her pleas for help constituted a sufficient foundation for the court to find that she was still "under the stress of excitement caused by" a startling event when she told her neighbor that she was afraid of her boyfriend. Md. Rule 5-803(b)(2). Accordingly, we shall affirm Appellant's convictions.

## BACKGROUND

The following account is derived from the evidence adduced at Appellant's jury trial on October 12 and 13, 2021, viewed in the light most favorable to the State. *Molina v. State*, 244 Md. App. 67, 87 (2019). Our summary of the trial record provides the necessary

background for our discussion of the dispositive issues in this appeal, rather than a comprehensive review of the evidence presented.

At approximately 7:30 A.M. on December 11, 2020, the St. Mary's County Sheriff's Department received emergency calls reporting that a woman outside of an apartment complex in the River Bay community was screaming for help. Deputy Courtney Edwards was dispatched to the scene and upon arrival she was approached by a woman later identified as Sarah Hockaday. Deputy Edwards observed that Ms. Hockaday "had a lot of blood in her mouth and on her hands" and was "crying" and "[v]ery fearful." Ms. Hockaday reported to Deputy Edwards that she was in severe pain and that "he was going crazy." Emergency medical personnel transported Ms. Hockaday to the hospital for treatment.

After alerting Ms. Hockaday's sister of the incident, Deputy Edwards attempted to gain entry to Ms. Hockaday's apartment but was unable to do so. Shortly thereafter, Deputy Edwards spoke with Ms. Hockaday while she was being treated. After obtaining Ms. Hockaday's statement, the Sheriff's Department applied for and obtained a warrant for Appellant's arrest. Ms. Carleigh Ruleman, a crime lab technician with the Sheriff's Department, collected DNA samples from Ms. Hockaday.

On December 28, 2020, Appellant turned himself in to the Sheriff's Department. Tragically, by then Ms. Hockaday had passed away on December 23, 2020, from causes unrelated to the assault.

A grand jury indicted Appellant on five charges: (1) attempted second-degree murder of Ms. Hockaday; (2) first-degree assault of Ms. Hockaday by strangulation; (3)

first-degree assault of Ms. Hockaday by causing or attempting to cause serious physical injury; (4) second-degree assault of Ms. Hockaday by grabbing her hair; and (5) second-degree assault of Ms. Hockaday by striking her with a belt.

During the course of their investigation, on April 17, 2021, police presented Ms. Deanna Day—Ms. Hockaday's neighbor and an eyewitness to the assault—with a photo array prepared by the crime lab technician, Ms. Ruleman. Ms. Day identified Appellant—Photo Number 2 in the array—as the boyfriend and perpetrator of the assault. Deputy Richard Wilhelmi, the officer who presented the photo array and observed Ms. Day's reaction, noted that she identified Appellant after approximately ten seconds. According to Deputy Wilhelmi, Ms. Day stated that her level of certainty about the identification was "I'm pretty sure. I believe so." After Deputy Wilhelmi followed up on Ms. Day's confidence about the veracity of the identification, Ms. Day reiterated "um, I believe so."

At trial on October 12, 2021, the primary issues became establishing Appellant's identity as the perpetrator of the assault on Ms. Hockaday and proving the severity of Ms. Hockaday's injuries. The State presented its case-in-chief over two days, calling eight witnesses. Appellant exercised his right to not testify at trial and further opted to not call witnesses or present evidence, instead taking the position that Ms. Hockaday's level of intoxication on the morning of the assault rendered her reporting unreliable. Defense counsel also underscored during opening argument that "[w]e don't know who else she had contact with" due to the presence of other DNA from other male contributors found under her fingernails.

To establish Appellant's identity as the perpetrator, the State relied primarily on the testimony of Ms. Day. She told the jury she lived in the River Bay community and knew Ms. Hockaday, and clarified that she knew Appellant by sight but not by name. She recalled that, sometime after midnight on December 11, 2020, she was outside smoking a cigarette in the parking lot when Ms. Hockaday "ran outside with no shoes." Ms. Hockaday was "crying" and "ran over" to Ms. Day "pleading" for help. Ms. Day said that "then she ran into my house . . . I really didn't know what was going on, like, what was she afraid of."

Next, over defense counsel's objection, Ms. Day was permitted to relate that Ms. Hockaday, after entering Ms. Day's residence, stated that she was "afraid of her boyfriend." In overruling the objection, the court engaged in the following discussion with counsel:

> [DEFENSE COUNSEL]: Objection to hearsay, she's testifying about what was (indiscernible).
>
> [THE STATE]: It's an excited utterance. I mean, crying, fearful, immediately coming in, obviously she had a startling event.
>
> [DEFENSE COUNSEL]: If I can be heard?
>
> THE COURT: Sure.
>
> [DEFENSE COUNSEL]: Number one, I don't think a sufficient foundation has been laid for that, that this particular utterance was an excited utterance. You have to lay a foundation for that.
> Number two, the statement would have to be about an event that immediately -- that immediately preceded . . . .
>
> [THE STATE]: . . . . as far as the foundation, the foundation is as simple as the demeanor of being -- appearing under a startling event, and still being under that demeanor, which is the crying, the fearful, and running into her house, she then said what happened. That is an excited utterance.

5

THE COURT: . . . is it the State's position that this assault had already occurred at this point?

[THE STATE]: Part of it. Some of it.

\*       \*       \*

THE COURT: Based on her testimony as to the fact that Ms. Hockaday came running out, was without shoes, approached her, was crying, and the witness' statement that she was afraid and went into the residence with the witness, I am going to overrule the objection.

Ms. Day resumed her testimony, explaining that she agreed to let Ms. Hockaday stay "downstairs" in her residence for the night. She said that, after she went upstairs to go to sleep, she "saw [Appellant] and they started to argue" inside her apartment. Ms. Day had "no idea" how Appellant entered her apartment. She testified that Ms. Hockaday began running up the stairs and "[h]e ran up the stairs" in pursuit. She saw Appellant hit Ms. Hockaday and "heard her fall down the stairs." Because she was afraid, Ms. Day stayed in her bedroom and eventually left her apartment later that night. Ms. Day said that when she returned the next day, the damage caused her home to look "like a completely different place." At the end of her direct examination, Ms. Day explained that she went to the police station where she identified Appellant in a photo array as the boyfriend and perpetrator of the assault.

On cross-examination, Ms. Day denied that Ms. Hockaday exhibited any outward signs of intoxication. When asked how long Ms. Hockaday was in her apartment before she heard the boyfriend downstairs, Ms. Day responded, "maybe an hour and a half or an hour . . . I told her, you know, stay here and get comfortable. If you leave, lo[c]k my door, I'm going upstairs and go to bed."

6

Ms. Hockaday's mother, Ms. Patricia Jones, testified that she knew Appellant as "a friend of [her] daughter's" whom she had talked to approximately 10 to 15 times. She claimed that on December 12, 2020—the day after the assault—she received a call from Appellant during which he "apologize[d] for what he had done" and admitted that "he beat [Ms. Hockaday]."

Dr. Adrienne Wilson, an emergency urgent care physician, treated Ms. Hockaday after she was taken to MedStar St. Mary's Hospital by ambulance. At trial, Dr. Wilson was accepted as an expert in emergency care and physical trauma. Through her testimony, the State moved into evidence several photographs taken of Ms. Hockaday's injuries depicting severe bruising, lacerations, a significant amount of blood, and marks around Ms. Hockaday's neck.

Dr. Wilson was asked whether, during her assessment of a patient like Ms. Hockaday, she asks the patient any questions in order to treat the patient. Dr. Wilson responded affirmatively and explained that she asks questions "[t]o try to figure out what trauma has happened to their body, in order to figure out what potential injuries could be there." When asked whether "all injuries are apparent to your eyesight when the . . . patients present to you," Dr. Wilson responded "No." Dr. Wilson then explained that she asked Ms. Hockaday what happened to her, and that the purpose of her question was:

> To assess what was the cause of injury in order to figure out what may be the injuries that she sustained, so I will know what to order, and also to ascertain her, you know, safety, to see if she needed any assistance as well.

Dr. Wilson's testimony was suspended at this juncture while the court heard defense counsel's objections outside the presence of the jury:

7

[DEFENSE COUNSEL]: . . . . The statements are hearsay. The question is are they admissible under [Maryland Rule] 5-803 (b) (4), as a statement for purposes of medical treatment or diagnosis. The Defense agrees that the description of what was done to Ms. Hockaday would qualify under that exception . . . .

However, the identity of the assailant is inadmissible. State versus Coates, 405 Maryland 141 is a 2008 case, identity of alleged abuser to forensic nurse is inadmissible as irrelevant to the treatment and diagnosis.

THE COURT: [State's counsel]?

[THE STATE]: Well, Your Honor, State versus Coates, I believe that was a specific, when they get to who did it, which in this case, she asked what happened . . . and that's different. And that in both State versus Griner, 168 Maryland App. 714 and Webster v. State in 151 Maryland App, 527, they both speak to that . . . .

When it's part of her statement, that does not make it inadmissible, because that's her statement. If you read Coates . . . after they say what happened, they specifically asked about identity. Asking about identity, has nothing to do with medical diagnosis. Correct. And if you read Griner, that was also a dual purpose case, in which, again, that statement, the child's statement to the nurse and the doctor in that case, because it was part of his statement of what happened to you, and he said my mom, and then went on to describe the injury . . . .

[DEFENSE COUNSEL]: . . . . The legal analysis is that the identity of the perpetrator is irrelevant to treatment. It's a relevancy issue. It's not a -- it's not how the question was phrased issue. It does not affect the doctor[']s treatment whatsoever who the perpetrator is.

The doctor just wants to know what are the physical events that happened that lead her to make certain treatments. That's what gives the otherwise inadmissible hearsay reliability. It's not a back door through which the prosecution can substantively admit the identity of the perpetrator. . . .

\*     \*     \*

THE COURT: All right . . . The doctor testified that it was for the purposes of assessing what medical treatment needed to be done, and the Court does find that the question was asked specifically for determining what happened as opposed to who did it, that the statement, very clearly, the statement was

made to the doctor to determine basically what happened, and the list of injuries was included in that.

The Court is going to deny the motion . . . .

Dr. Wilson then testified that Ms. Hockaday stated, in response to her inquiry about what happened to her, that "she was assaulted by her boyfriend multiple times since approximately one a.m." and experienced "an episode of loss of consciousness" which lasted approximately two minutes. Ms. Hockaday described her symptoms and the levels of pain "all over her body," including, more specifically, "headache, bilateral ear pain, right greater than left, facial pain, right greater than left," "bilateral chest wall pain[,]" and "pain at her C spine and sacrum." She also reported being choked, experiencing incontinence, and having pain on swallowing. Dr. Wilson observed bruising on Ms. Hockaday's neck but explained that a CT scan "didn't note any acute abnormalities." With regard to Ms. Hockaday's face, there were several soft tissue hematomas and she "had a laceration of her upper inner lip that needed to be sutured[.]" Dr. Wilson then performed an assessment during which Ms. Hockaday noted pain or tenderness in and around her face, chest, and down her spine. Based on her observations, Dr. Wilson concluded that Ms. Hockaday's injuries "were consistent with her story that she was assaulted." Dr. Wilson further concluded that Ms. Hockaday's symptoms were also consistent with having been strangled.

On cross-examination, Dr. Wilson explained that laboratory testing revealed Ms. Hockaday's urine to have contained high levels of alcohol and was positive for the presence of unidentified opiates. Before closing arguments, the trial court agreed to provide a

9

limiting instruction directing the jury to only consider Ms. Hockaday's statement to Dr. Wilson for the purpose of explaining Dr. Wilson's reasons for her opinion.

As part of its case-in-chief, the State also called Ms. Tiffany Keener, a forensic scientist with the Maryland State Police. She explained that she had performed Y-STR DNA analysis, comparing the swabs submitted by Ms. Ruleman with known samples from Ms. Hockaday and swabs taken by another officer containing known samples from Appellant. The results of her analysis showed that the DNA of three other male contributors were found on Ms. Hockaday's hands, and, that Appellant "could not be excluded" as the major contributor of DNA found on Ms. Hockaday's right hand.[1]

As previously noted, on October 13, 2021, the jury reached a verdict, finding Appellant not guilty of attempted second-degree murder, but guilty of two counts of first-degree assault.

---

[1] Ms. Keener explained that the terminology of "could not be excluded" was a common way to describe the results due to the unique nature of Y-STR testing. As Ms. Keener noted, Y-STR testing specifically targets male contributors of DNA because it examines "the DNA [that] is present on the Y chromosome," which only biological males possess. Though a useful technique in isolating a DNA profile and comparing it with that of a known male suspect, Y-STR testing cannot differentiate between males in the same paternal line, thus meaning that "grandfathers, father, son, all of those individuals would share the same Y-STR profile." For that reason, even though the Y-STR profile of Mr. Curtis in a sense "matched" that of the profile extracted from Ms. Hockaday's right hand, Ms. Keener explained that "I can't say that it matches them, because [there are] other people I know [that] have that same Y-STR profile"—*i.e.*, Mr. Curtis's paternal relatives.

## DISCUSSION

### *Standard of Review*

Whether the trial court properly admitted a particular statement under an exception to the rule against hearsay often requires separate inquiries with divergent standards of review. *Gordon v. State*, 431 Md. 527, 538 (2013). We review for clear error the trial court's preliminary findings as to the factual circumstances under which the statement was made. *Id.* at 537 (citing *State v. Walker*, 345 Md. 293, 325 (1997)) (footnote omitted). However, the trial court's holding as to whether those circumstances, as well as the content of the statement itself, render it admissible under a hearsay exception is a legal determination that we review without deference to the trial court's determination. *Bernadyn v. State*, 390 Md. 1, 7-8 (2005).

### I.

### Statement for Purposes of Medical Treatment or Diagnosis

### A. *Parties' Contentions*

Appellant contends that the trial court erred by permitting Dr. Wilson to testify that, after she asked Ms. Hockaday what happened to her, she told Dr. Wilson that she was assaulted "by her boyfriend." Appellant stresses that "[w]hile Ms. Hockaday's statement that she was assaulted was certainly pathologically germane, the identification of her alleged assailant is irrelevant to the course of treatment." Quoting from the Supreme Court of Maryland's decision in *State v. Coates*, 405 Md. 131, 146 (2008), Appellant urges that "[s]tatements to a medical practitioner as to the identity of the person who caused an injury are unlikely to be regarded by the declarant as related to diagnosis or treatment." Appellant

11

contends that the "pathologically germane" fact is that she was assaulted but "[w]ho assaulted her is of no medical importance." Thus, Appellant concludes that "the reliability of Ms. Hockaday's identification of her attacker cannot be presumed, since it was not made for medical diagnosis or treatment." Appellant further asserts that the trial court's error in admitting Ms. Hockaday's statement identifying her boyfriend as the perpetrator was not harmless beyond a reasonable doubt. According to Appellant, "the only evidence supporting the State's theory that [Appellant] committed the assault were the hearsay statements given by Dr. Wilson and Ms. Day."

The State counters that Dr. Wilson's testimony was properly admitted because, based on the circumstances, "the trial judge could reasonably [have found] that Dr. Wilson had a medical purpose in asking what happened" and that Ms. Hockaday believed her response was for a medical purpose. The State distinguishes the present case from *Coates* because Ms. Hockaday's statement "was made in a hospital setting hours after the assault, not 14 months later as in *Coates*." Also, the State points out that in the instant case "there was no question equivalent to the child in *Coates* asking 'are you going to find him now?'" suggesting the child believed she was being interviewed for an investigatory purpose. Especially because Ms. Hockaday "was actively suffering from her injuries[,]" the State presses, the trial court could have reasonably found that Ms. Hockaday "understood that she was speaking with Dr. Wilson for a medical purpose."

In the alternative, the State contends that even if the trial court erred in admitting Dr. Wilson's testimony, the error was harmless because other evidence admitted at trial established Appellant's identity as the perpetrator. Specifically, the State points out that

12

there was (1) eyewitness testimony from Ms. Day identifying Appellant as Ms. Hockaday's assailant, (2) testimony from Ms. Hockaday's mother that Appellant called her to apologize for assaulting Ms. Hockaday, and (3) DNA evidence which further supported the identification.

### B. *Contours of the Medical Treatment Exception*

Because a "patient's statements to his [or her] doctor are apt to be sincere when made with an awareness that the quality and success of the treatment may largely depend on the accuracy of the information provided[,]" Maryland Rule 5-803(b)(4) excepts from the rule against hearsay certain statements made to medical providers in contemplation of treatment. *Coates*, 405 Md. at 141-42. Rule 5-803(b)(4) provides:

> (4) *Statements for Purposes of Medical Diagnosis or Treatment.* Statements made for purposes of medical treatment or medical diagnosis in contemplation of treatment and describing medical history, or past or present symptoms, pain, or sensation, **or the inception or general character of the cause or external sources thereof insofar** as reasonably pertinent to treatment or diagnosis in contemplation of treatment.

Md. Rule 5-803(b)(4) (emphasis added). Under the plain language of the Rule, for a statement to qualify under the exception, the proponent of the statement must lay a foundation specifying the circumstances under which the statement was made (*i.e.*, for purposes of treatment or diagnosis and in contemplation thereof) as well as the content of the statement itself (*i.e.*, describing symptoms, pain, sensation, or cause as reasonably pertinent to diagnosis or treatment). That is hardly exceptional, as several other Rule 5-803(b) exceptions contain similar situational and content-related preconditions to admissibility. *See, e.g.*, Md. Rule 5-803(b)(1) (present-sense impression must describe or

explain an event or condition (content-related restriction) *and* be made contemporaneously or immediately thereafter (situational restriction)); Md. Rule 5-803(b)(2) (excited utterance must relate to a startling event or condition (content-related restriction) *and* be made while still under the stress of the event or condition (situational restriction)).

We have previously held that, in the direct aftermath of an assault, a victim's statements describing the assault can be admissible under Rule 5-803(b)(4). For example, in *Webster v. State*, we examined whether statements made to a medical provider for dual treatment and forensic purposes could properly be admitted under Rule 5-803(b)(4). 151 Md. App. 527 (2003). There, a four-year-old girl was sexually assaulted in a neighbor's bathroom and, after being transported to the hospital for an examination, stated to her treating "sexual assault forensic examination" nurse that "a man that she didn't know had licked her [private area] and she told him not to and he said he was going to keep on doing it." *Id.* at 530-31 (internal quotation marks omitted). Despite the partial forensic/evidence-gathering purpose of the examination, we held that the statement was properly admitted at trial under Rule 5-803(b)(4). *Id.* at 551-52. We explained that it is crucial for courts to "examine both the reason that a medical provider asked the [] victim to describe the assault, and the victim's subjective purpose in making the statement" because "only statements that are both **taken and given** in contemplation of medical treatment or medical diagnosis" properly fit within the exception. *Id.* at 537 (emphasis in original).

Under the circumstances presented at trial, we concluded that the victim's statement was properly admitted because the victim was capable of understanding the medical purpose of the examination, even if there was also an overarching investigatory purpose.

14

*Webster*, 151 Md. App. at 551-52. We explained that "a sexual assault victim's statement describing the assault may be admissible . . . even though it was taken and given for dual medical and forensic purposes" so long as "the challenged statement has some value in diagnosis or treatment[.]" *Id.* at 545. Often, that will be the case because "what happened to a sexual assault victim may be critically important in deciding where to examine her, what range of medical problems to look for, and, ultimately, how to treat her." *Id.* at 546. Applying that logic, we considered the victim's statement to fall within those boundaries because (1) it was *taken* by the nurse for the medical reason of detecting whether STD testing was necessary and (2) it was *given* by the victim under circumstances suggesting that she understood the medical purpose of the nurse's questions given that she "was questioned in emergent circumstances, within a few hours of the assault, in a hospital setting" by a uniformed nurse who simply asked her "what happened." *Id.* at 549-52.

Thornier issues have arisen, however, in determining whether statements identifying the perpetrator of an assault, rather than merely describing it, may be admissible under Rule 5-803(b)(4). We addressed that issue in *In re Rachel T.*, a CINA case involving a six-year-old girl who had suffered from sexual abuse at the hands of her father. 77 Md. App. 20 (1988). There, the victim displayed an onset of bleeding from her private area and was referred for treatment to Dr. Timothy Doran, a specialist in pediatric gynecology. *Id.* at 23-25. As part of his treatment team, Dr. Doran utilized a social worker to speak with the victim and gather her history of symptoms. *Id.* at 25. During those conversations, the victim revealed that she "had a secret with her Dad" and that if her mother found out, "her father would be in big trouble." *Id.* From there, the victim spoke with a child psychologist

15

and, through the use of anatomically correct dolls, revealed that her father had raped her on at least two occasions. *Id.* at 25-26. The Carroll County Department of Social Services initiated CINA proceedings, and at a *de novo* hearing on the parents' exceptions to her CINA status, the trial court excluded the victim's "statements to the social worker who took her medical history and which identified her father as the abuser." *Id.* at 27. We held that the trial court erred in excluding this testimony. *Id.* at 36.

Initially, we explained that the child at age five had attained a sufficiently advanced level of cognitive development and was apprised of the medical nature of the examination—*i.e.*, to discover why she had been bleeding from her genital area. *Id.* at 34-35. Accordingly, we concluded that the victim "knew that her statements would be used to provide appropriate treatment" and that she made them in contemplation of treatment or diagnosis. *Id.* at 35. Notably, we also determined that there was a medical purpose to ascertaining the identity of the child's assailant because the "blood and [] abnormally dilated hymen" presented the danger that the child "had been exposed to a venereal disease, and may have required antibiotics" or had been penetrated by a foreign object, raising the possibility that "a tetanus shot might have been required." *Id.* at 36. We surmised that learning the identity of the abuser "was also important in the instant case because effective treatment might have required [the child's] removal from the home." *Id.*

In *Griner v. State*, we focused appropriately on the state of mind of the declarant-victim in holding that statements made to a uniformed nurse were admissible under Maryland Rule 5-803(b)(4). 168 Md. App. 714 (2006). In that case, the child-victim was removed from the home of his grandmother (whom he referred to as his mother) after

16

officers performing a welfare check observed the child with bruises and lacerations. *Id.* at 720, 723. The child was transported to Holy Cross Hospital, where he spoke with his treating nurse after being admitted to the pediatric ward. *Id.* at 726. During that conversation, the nurse asked the child "what happened to his eye" and the child replied that he had fallen. *Id.* When pressed on the matter, the child responded "[w]ell actually my mom hit me with a stick." *Id.* The nurse was permitted to testify at trial as to her observations of the child's injuries and his responses to her questions, including his identification of his grandmother as his abuser. *Id.* at 736-38. We concluded that the trial court did not err in admitting this testimony. *Id.* at 747.

We began our analysis by noting that the medical treatment or diagnosis exception "specifically contemplates the admission of statements describing how the patient incurred the injury for which he is seeking medical care." *Id.* at 745 (quoting *Webster*, 151 Md. App. at 536). Applying that rationale, we concluded that "there was enough evidence that [the child], who was four-years and eight-months old, understood that there were medical reasons for telling [the nurse] what happened." *Id.* at 746. We reasoned that the child reasonably understood the medical purpose of the interview considering that "[his] eye was still nearly swollen shut[,]" the nurse "explained to [him] that she was going to take care of him," and the child "was able to respond appropriately" to the nurse. *Id.* Accordingly, because the child understood that the purpose of the interview was to obtain treatment for his injuries, his statements were admissible. *Id.*

Thereafter, in *State v. Coates*, the Supreme Court of Maryland provided crucial guidance on the boundaries of Rule 5-803(b)(4). 405 Md. 131 (2008). In that case, Coates

stood accused of sexual offenses against Jazmyne T., a minor, which "took place in September 2002, but were not discovered until approximately one year later." *Id.* at 134. Before trial, Coates filed a motion *in limine* to exclude the testimony of Heidi Bresee, a forensic nurse practitioner who conducted a sexual assault examination of Jazmyne T. approximately fourteen months after the alleged offenses. *Id.* at 135. The motion was denied and Bresee was permitted to testify at trial. *Id.* at 136. In the course of her testimony, Bresee recounted Jazmyne T.'s statements detailing how Coates had forced her to engage in oral and vaginal intercourse and that Jazmyne asked, at the end of the interview, "[a]re you going to go out and find him now?" *Id.* at 137-39. Coates noted a timely appeal and we reversed, explaining that Bresee's testimony was improperly admitted under Rule 8-503(b)(4) because Jazmyne T.'s statements identifying Coates as the culprit were not pathologically germane to any course of treatment. *Coates v. State*, 175 Md. App. 588, 627-28 (2007), *aff'd*, 405 Md. 131 (2008).

The Supreme Court affirmed our decision, noting that although there were medical purposes to Bresee's examination, "the overarching purpose was forensic in nature" because Bresee "sought information as to the identity of the perpetrator and the details of his criminal misconduct." *Coates*, 405 Md. at 143 (citation omitted). The Court clarified that, although the intent of the medical provider is a relevant circumstance to consider, the crucial inquiry is "whether the declarant believed that there was a medical purpose for the examination." *Id.* at 144 (citation omitted). The Court did not consider that to be the case given that "Jazmyne T. did not present with any symptoms at the time of her examination" and clearly understood the investigatory nature of the interaction as evidenced by her

18

question "are you going to go out and find him now?" *Id.* at 145. The Court instructed that "where, as in the present case, the circumstances indicate that the declarant was not aware that her statements to a medical practitioner were for purposes of medical treatment or diagnosis, the reliability of her statements is no longer assured[.]" *Id.* at 147. Accordingly, the Court held that Bresee's testimony was improperly admitted under Rule 5-803(b)(4). More specifically, regarding the child's statement identifying her alleged abuser, the Court ruled that it was inadmissible under Rule 5-803(b)(4) "because the identity of the perpetrator is not ordinarily of strict medical importance, and [the child] was not aware that her statement was relevant to medical treatment or diagnosis." *Id.* at 147.

## C. *Analysis*

Returning to the present case, we begin with what is undisputed: Ms. Hockaday's statements relating that she was assaulted, the nature of the assault, and her ensuing symptoms, were admissible as statements for purposes of medical treatment or diagnosis under Maryland Rule 5-803(b)(4). *Webster*, 151 Md. App. at 545 (explaining that a "victim's statement describing the assault may be admissible . . . even though it was taken and given for dual medical and forensic purposes" so long as "the challenged statement has some value in diagnosis or treatment[.]"). Our single task is to determine whether the trial court erred by admitting into evidence, as reasonably pertinent to diagnosis or treatment, Ms. Hockaday's statement that she was assaulted by her "boyfriend," after Dr. Wilson asked what happened to her.

In defense of the trial court's admission of the statement, the State appropriately focuses on the fact that it "was made in a hospital setting hours after the assault" while Ms.

Hockaday "was actively suffering from her injuries[,]" and urges, therefore, that Ms. Hockaday "understood that she was speaking with Dr. Wilson for a medical purpose." As the Maryland Supreme Court in *Coates* made abundantly clear, the crucial inquiry in determining the applicability of the medical treatment exception is "whether the declarant believed that there was a medical purpose for the examination." *Coates*, 405 Md. at 144. In other words, the declarant's state of mind is the touchstone of our analysis precisely because the logic underlying the exception depends on the notion that a "patient's statements to his [or her] doctor are apt to be sincere when made with an awareness that the quality and success of the treatment may largely depend on the accuracy of the information provided." *Id.* at 142.

Here, the record establishes that Ms. Hockaday readily perceived the medical purpose of Dr. Wilson's examination. Indeed, the circumstances presented here are nearly indistinguishable from *Webster* considering that Ms. Hockaday, like the victim in that case, "was questioned in emergent circumstances, within a few hours of the assault, in a hospital setting" by a medical provider who simply asked her "what happened." *Webster*, 151 Md. App. at 551. These facts are far removed from the situation presented in *Coates*, where the victim was questioned by a forensic nurse practitioner approximately *fourteen months* after the alleged offenses. *See Coates*, 405 Md. at 134. Moreover, the questioning in *Coates*, as the Court observed, took the form "of a child-friendly interrogation, akin to a prosecutorial probing of 'whodunnit,' rather than an inquiry related to medical concerns." *Id.* at 143 (quoting *Coates*, 175 Md. App. at 627). It is evident that the child-victim in that

case picked up on the investigatory nature of the examination, as she directly asked her examiner "are you going to go out and find him now?" *Id.* at 145.

Still, as Appellant points out, the *Coates* decision highlights that a statement relating the identity of the perpetrator must be considered very carefully. The *Coates* Court warned that "[s]tatements to a medical practitioner as to the identity of the person who caused an injury are unlikely to be regarded by the declarant as related to diagnosis or treatment" because "it is unlikely that a patient would believe statements fixing fault to an individual" to be germane to treatment. *Coates*, 405 Md. at 146 (citation omitted). We pay special regard to the instruction in Rule 8-503(b)(4) that the statement must "describ[e] medical history, or past or present symptoms, pain, or sensation, ***or the inception or general character of the cause or external sources thereof insofar as reasonably pertinent to treatment or diagnosis in contemplation of treatment***." Md. Rule 8-503(b)(4) (emphasis added). To be sure, an identifying statement intended to fix fault or function as an accusation of guilt might not be "reasonably pertinent" to treatment. Yet, as established by *Rachel T.*, a statement identifying the perpetrator—*i.e.*, the external "cause" of the underlying injuries—can indeed be medically relevant in cases of sexual abuse, such as where the victim may have been exposed to a venereal disease, or, in the context of child abuse, where "effective treatment might have required [the child's] removal from the home." *Rachel T.*, 77 Md. App. at 36.

The logic of *Rachel T.*, *Griner*, and *Webster* naturally extends to the present situation involving intimate partner violence. We observe that other state appellate courts, in applying the medical treatment exception under their respective evidentiary rules, have

recognized that ascertaining the identity of the perpetrator in cases of intimate partner violence can be "relevant to the effort of the emergency room physician to treat the abuse as an underlying cause, rather than simply the injuries that were inflicted" due to the cumulative mental, physical, and emotional impact that can be inflicted by a continuing pattern of abuse. *See Oldman v. State*, 998 P.2d 957, 962 (Wyo. 2000).

The Supreme Court of Louisiana, for example, observed in *State v. Koederitz*, 166 So. 3d 981, 985-86 (La. 2015), that the medical relevance of ascertaining the identity of the perpetrator in circumstances of intimate partner violence reflects "the *current* integrated approach to the treatment of domestic violence cases in the medical community" due to the emotional, psychological, and physical injuries which may be inflicted by recurrent domestic abuse, as well as the need to remove the victim from the harmful situation. *Id.* at 985 (citation omitted).[2] *See also State v. Williams,* 154 P.3d 322, 328 (Wash. Ct. App. 2007) ("Generally, statements of fault are inadmissible, but . . . [i]n domestic violence and sexual abuse situations, a declarant's statement disclosing the identity of a closely-related perpetrator is admissible under [Washington State Evidence Rule] 803(a)(4) because part

---

[2] The *Koederitz* opinion quotes a portion of the American Medical Association Policy Statement on Family and Intimate Partner Violence encouraging physicians to "'[r]outinely inquire about the family violence histories of their patients *as this knowledge is essential for effective diagnosis and care*[.]'" *Koederitz*, 166 So. 3d at 985-86 (quoting *Family and Intimate Partner Violence H-515.965*, AM. MED. ASS'N, https://policysearch.ama-assn.org/policyfinder/detail/family%20and%20intimate%20partner?uri=%2FAMADoc%2FHOD.xml-0-4664.xml (last modified 2019), *archived at* https://perma.cc/A2G9-2HC8 (emphasis added in *Koederitz*).

of reasonable treatment and therapy is to prevent recurrence and future injury.") (internal quotation marks and citations omitted).

As in Maryland, federal courts have held that "[w]hen the abuser is a member of the [child] victim's immediate household, however, a statement of identity may be reasonably pertinent to treatment or diagnosis because the doctor has an obligation to insure the child is removed from the abusive environment."[3]  7 MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 803:4 (9th ed. 2022) (internal citations to *U. S. v. Renville*, 779 F.2d 430, 436-38 (8th Cir.1985) removed); *see also U. S. v. George*, 960 F.2d 97, 99 (9th Cir. 1992) (observing that "[s]exual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser[,]" which "may be pertinent to the diagnosis and treatment of sexually transmitted diseases"); *U.S. v. Balfany*, 965 F.2d 575, 579–80 (8th Cir. 1992) (holding that a child victim's statement to her doctor, that her mother's partner sexually assaulted her, was admissible under Fed. R. Evid. 803(4), where the doctor explained why the victim's "history, including the identity of her

---

[3]  Maryland Rule 5-803(b)(4) is derived from the Federal Rule of Evidence 803(4); however, application of these rules differs "in one significant way."  6A LYNN MCLAIN, MARYLAND EVIDENCE STATE AND FEDERAL 510-11 (3d ed. 2013).  "[T]he federal rule jettisons the distinction retained in Maryland between (1) the declarant's statements made for purposes of either (a) medical treatment or (b) diagnosis in contemplation of treatment and (2) those made only for purposes of medical diagnosis by an expert witness, unrelated to any possible treatment."  *Id.*  Under the Maryland Rule, only the former may be admitted as substantive proof, whereas under the Federal Rule, either may be admitted.  *Id.* Accordingly, decisional law interpreting the Federal Rule is persuasive to our application of the Maryland Rule 5-803(b)(4) in the instant case because Ms. Hockaday's statement was made to the emergency physician during the course of her treatment.

assailant, was pertinent to his diagnosis and recommended treatment"); *Morgan v. Foretich*, 846 F.2d 941, 949 (4th Cir. 1988) (quoting *Renville*, 779 F.2d at 437, for the proposition that "'[s]exual abuse of children at home presents a wholly different situation' from that normally encountered in Rule 803(4) cases and that situation requires great caution in excluding highly pertinent evidence"). *But see U.S. v. Beaulieu*, 194 F.3d 918 (8th Cir. 1999) (barring statements by child victim that she had been abused by an acquaintance where there was "no evidence in the record that the nurse or psychologist explained to [the victim] that the identity of her abuser was important to diagnosis or treatment" and as indicated by the victim's own testimony "she understood the purpose of her visits with the nurse and psychologist was '[j]ust to get evidence'").

In *U.S. v. Joe*, Melvin Joe admitted to the murders of his wife and his neighbor, but denied specific intent on the grounds that he was "intoxicated and enraged over [his] impending divorce[.]" 8 F.3d 1488, 1491 (10th Cir. 1993). To impeach Mr. Joe, the prosecution presented testimony by Ms. Joe's family physician that eight days before the murder, while treating Ms. Joe for injuries she sustained from a rape, she identified her assailant as her husband and said that "she was 'afraid sometimes' because Mr. Joe suspected her of having an extramarital affair and had threatened to kill her if he caught her with another man." *Id.* The court of appeals held that her statements were admissible under Fed. R. Evid. 803(4) because "the rape and threat statements were made by Ms. Joe in the course of her treatment by her doctor." *Id.* at 1493. The court acknowledged that "a declarant's statement relating the *identity* of the person allegedly responsible for her injuries is not ordinarily admissible under Rule 803(4) because statements of identity are

24

not normally thought necessary to promote effective treatment." *Id.* at 1494 (citing *U.S. v. Renville,* 779 F.2d 430, 436 (8th Cir.1985)). However, drawing on decisional law from other circuits in which courts held that "statements made by a child to a physician which identify the sexual abuser as a member of the family or household are 'reasonably pertinent to diagnosis or treatment,'" the court extended the exception to cases involving adults because "[a]ll victims of domestic sexual abuse suffer emotional and psychological injuries, the exact nature and extent of which depend on the identity of the abuser." *Id.* at 1494. Accordingly, the *Joe* Court held that a "domestic sexual abuser's identity is admissible under [Federal] Rule 803(4) where the abuser has such an intimate relationship with the victim that the abuser's identity becomes 'reasonably pertinent' to the victim's proper treatment." *Id.* at 1495; *see also U.S. v. John*, No. 13 CR 2730 MV, 2014 WL 12691032, at *2-3 (D.N.M. Aug. 13, 2014) (holding a victim's statement made to a Sexual Assault Nurse Examiner that identified the victim's cousin as her assailant was admissible under Fed. R. Evid. 803(4) and indicating that, in "accordance with" *Joe* and other caselaw, the identity of the abuser was reasonably pertinent to the victim's diagnosis and treatment) (citing *Joe*, 8 F.3d at 1494, and *U.S. v. Tome*, 61 F.3d 1446, 1450 (10th Cir. 1995)).

In line with these persuasive decisions, we conclude that application of the medical treatment exception may permit identification of the abuser in cases of intimate partner violence. Accordingly, we hold that the trial court did not err in admitting Ms. Hockaday's statement to Dr. Wilson under the hearsay exception for statements made for purposes of medical treatment or diagnosis under Maryland Rule 5-803(b)(4). First, it is apparent that Ms. Hockaday's statement was made for medical purposes because she was in a hospital

setting, she was actively suffering from her injuries, and she was "in emergent circumstances, within a few hours of the assault." *Webster*, 151 Md. App. at 552. Moreover, her statement was made in response to a medical provider who simply asked her "what happened." *Id.* Notably, she did not give Appellant's name in her description of what happened to her. Instead, she stated that "she was assaulted by her boyfriend multiple times[,]" and that she was unconscious for a period of time.

Second, Ms. Hockaday's statement described the external cause of her symptoms (*i.e.*, the Appellant) and was reasonably pertinent to diagnosis or treatment of her injuries as a victim of intimate partner violence, with all the attendant psychological and emotional injuries which may derive therefrom. Dr. Wilson testified that she asked what happened, "[t]o assess what was the cause of injury in order to figure out what may be the injuries that she sustained, so I will know what to order, and also to ascertain her, you know, safety, to see if she needed any assistance as well." Clearly, by telling Dr. Wilson that her boyfriend had assaulted her multiple times, and that she was unconscious for a period of time, Ms. Hockaday was letting Dr. Wilson know that she may need to take tests and examine her for physical injuries and mental trauma that may not otherwise be apparent.

And even assuming it was error to admit the statement, we hold, upon our own independent review of the record, that the error was harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659 (1976). In making that determination, we "consider whether the evidence presented in error was cumulative evidence"—*i.e.*, that which "tends to prove the same point as other evidence presented during the trial[.]" *Dove v. State*, 415 Md. 727, 743-44 (2010). Here, the impact of Ms. Hockaday's identification of her

"boyfriend" as her assailant was cumulative in relation to the other evidence presented at the trial. First, as previously noted, Ms. Hockaday's statement did not identify Appellant by name and was only damaging to his identity defense when connected with Ms. Day's testimony that Appellant was in fact Ms. Hockaday's boyfriend. Ms. Day, of course, was an eyewitness to the ongoing assault, part of which took place in her own apartment. Ms. Day testified that she had seen Appellant in the past and knew that he lived with Ms. Hockaday in her apartment. After the assault, she went to the police station and identified Appellant—Photo Number 2 in the array—as the boyfriend and perpetrator of the assault.

Contrary to Appellant's contentions, there was other evidence adduced at trial which pointed to Appellant as the culprit. Ms. Hockaday's mother testified that Appellant himself called her and confessed to the assault. DNA evidence also suggested that Appellant was the perpetrator of the assault. Certainly, the DNA evidence might not be inherently incriminating considering Appellant's relationship with Ms. Hockaday, but the presence of his DNA on her right hand and fingernails, as pointed out by the State in closing argument, would also be consistent with Ms. Hockaday attempting to fight off Appellant in the course of the assault.

In short, we are convinced that because of the other evidence presented, Ms. Hockaday's statement to Dr. Wilson identifying "her boyfriend" as her assailant did not contribute to the guilty verdicts, especially when the trial court provided the jury with a limiting instruction directing the jury to only consider Ms. Hockaday's statement for the purposes of explaining the reasons for Dr. Wilson's medical opinions.

27

## Excited Utterance

### A. *Parties' Contentions*

Appellant assigns error to the trial court's ruling, over defense counsel's objection, to permit Ms. Day to testify that Ms. Hockaday told her that she was afraid of her boyfriend. According to Appellant, the State failed to lay a sufficient foundation to show that Ms. Hockaday was still under the stress of a startling event when the statement was made and, therefore, the State failed to prove the statement fell within the excited utterance exception to the hearsay rule. Appellant points out that Ms. Hockaday only gave the statement after she had entered Ms. Day's apartment, "thus physically removing herself from any imminent danger." Appellant also observes that there was "no indication given as to how much time elapsed before Ms. Hockaday purportedly made her statement" once inside Ms. Day's apartment. Appellant emphasizes that Ms. Hockaday "had been in no fewer than three separate locations before she purportedly made her statement to Ms. Day." Accordingly, Appellant posits that the record does not sufficiently establish that Ms. Hockaday was still under the stress of whatever startling event prompted her to enter Ms. Day's apartment.

The State responds that we must view the factual circumstances surrounding Ms. Hockaday's statement "with deference to the lower court's understanding of the facts and in consideration of the totality of the circumstances surrounding the statement." The State emphasizes that the trial court's ruling to permit the hearsay was "[b]ased on [Ms. Day's] testimony . . . that Ms. Hockaday came running out, was without shoes, approached her,

[and] was crying[.]" The State points to Ms. Day's testimony that "Hockaday ran into her house, that Hockaday was pleading for help, and that Hockaday appeared scared and afraid." Although the State concedes that the timing of the statement is unclear from the record, the State urges that "a lapse in time is not determinative of an excited utterance" and contends that the court "could have reasonably concluded that there was evidence [Ms.] Hockaday exhibited a startled mental state throughout her interaction with Day[.]"

## B. *Foundation Requirements of an Excited Utterance*

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). Maryland Rule 5-802 directs that, "[e]xcept as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible." It is well-established in our jurisprudence that hearsay "will be *excluded*, unless the *proponent* demonstrates its probable *trustworthiness*" by establishing that a recognized exception to the rule against admissibility is applicable. *Cassidy v. State*, 74 Md. App. 1, 8 (1988). The proponent of the evidence bears the burden of proving that the statement, and the circumstances under which it was made, fall within the confines of an applicable exception. *Id.* at 7-8.

Maryland Rule 5-803(b)(2) recognizes an exception to the rule against hearsay, allowing the proponent to admit "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." Md. Rule 5-803(b)(2). The rationale behind the "excited utterance" exception is that "the startling event suspends the declarant's process of reflective thought, thus

29

reducing the likelihood of fabrication." *State v. Harrell*, 348 Md. 69, 77 (1997) (citations omitted). To determine whether a statement qualifies as an excited utterance, we "examine the totality of the circumstances" to discern whether "the declaration was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant . . . [who is] still emotionally engulfed by the situation." *Id.* (quoting *Deloso v. State*, 37 Md. App. 101, 106 (1977)) (alteration in original) (some citations omitted). *See also Mason v. State*, 258 Md. App. 266, 290 (2023) (explaining that one of the features of the present sense impression exception that distinguishes it from the excited utterance exception is that it does not require that the declarant be in a state of excitement).

The proponent for the admission of a hearsay statement as an excited utterance must lay a foundation meeting several requirements, as indicated by the text of Rule 5-803(b)(2) and corresponding decisional law. First, the proponent must establish that an exciting or startling event occurred, and that the declarant had personal knowledge of that event. *Parker v. State*, 365 Md. 299, 314-17 (2001). To establish personal knowledge, the proponent may rely, in part, on "the content of the statements and the surrounding circumstances" under which they were made. *Id.* at 316-17 (citing *State v. Jones*, 311 Md. 23, 30-31 (1987)). In *Parker*, for example, the trial court permitted a police officer to recount statements made by unknown eyewitnesses to a shooting a few minutes after the shooting terminated. *Id.* at 311-12. The eyewitnesses informed the officer of the nature of the shooting and gave detailed descriptions of the gunman's height, build, hairstyle, and clothing. *Id.* at 312. The Supreme Court of Maryland concluded that the statements were

properly admitted as excited utterances, explaining that the personal knowledge requirement was established by the surrounding circumstances such as the short lapse of time from the shooting, the witnesses being "emotional and visibly shaken[,]" and their statements to "the officer that they were in the residence when two men ran through the residence."[4] *Id.* at 316.

Second, the proponent must establish that the statement relates to the underlying startling event. In *Harrell*, the Supreme Court of Maryland explained that some mere indicia of the spontaneity of the challenged statement is not sufficient to meet this burden; instead, the term "relating" in Rule 5-803(b)(2) imposes an entirely separate requirement "on the subject matter of an admissible excited utterance." *Harrell*, 348 Md. at 79-82. In *Harrell*, a police officer responded to a disturbance call and observed the defendant kicking the victim while she laid on the ground. *Id.* at 73. Less than two minutes later, the officer interviewed the victim, who had minor cuts and bruises, and a torn blouse, and was "crying and appeared very emotional and upset." *Id.* at 73-74. The officer testified at trial, over defense counsel's objection, that the victim "told him that Harrell 'beat me up and he stole that car there[.]'" *Id.* at 74. The Court held that the portion of the victim-declarant's statement accusing the defendant of a prior car theft had "absolutely nothing to do with" the underlying startling event (the defendant's battery) and therefore could not be admitted

---

[4] We note that in *Parker*, where the officer could not identify the eyewitnesses, the Court examined the admissibility of the hearsay statements under heightened scrutiny because "a party seeking to introduce such a statement carries a burden heavier than where the declarant is identified to demonstrate the statements circumstantial trustworthiness." *Parker*, 365 Md. at 314 (internal citation omitted). By contrast, in this case Ms. Day testified at trial and was cross-examined by defense counsel.

under the exited utterance exception. *Id.* at 82-83; *see also Morten v. State*, 242 Md. App. 537, 552 (2019) (explaining that the subject-matter requirement of Rule 5-803(b)(2) normally entails "a description of the exciting event and of the declarant's unreflective response to the emotional trauma of the excitement").

Third, the proponent of a statement purporting to fall within the excited utterance exception must establish the spontaneity of the statement. In other words, the proponent must show that the declarant was still under the stress of the startling event at the time the statement was made and that the statement was not the product of reflective thought. The *Harrell* case is again instructive here because the Court found that a portion of the victim's statement—that Harrell "beat me up"—qualified as an excited utterance. *Harrell*, 348 Md. at 74, 76-83. The Court held that he "beat me up" was a spontaneous statement that related directly to the startling event. *Id.* at 82. The Court explained that the victim was still "emotionally engulfed" by the situation, considering that she was crying, and "appeared very emotional and upset[,]" and less than two minutes had passed from the time of the battery to the interview. *Id.* at 74, 78. Although the Court noted that "one primary consideration" in determining whether a statement was spontaneous "is the time between the startling event and the declarant's statement[,]" the Court also noted that the amount of time elapsed "is not alone determinative." *Id.* at 77 (citing *Mouzone v. State*, 294 Md. 692, 689 (1982)).

Similarly, in *Davis v. State*, this Court confronted a situation in which the victim's statement followed the predicate assault by approximately fifteen minutes. 125 Md. App. 713 (1999). In that case, Officer Robert Neuens—the State's key witness at trial—

responded to a reported incident and arrived at the scene to find "another officer standing over a man and a woman who were partially disrobed." *Id.* at 715. Officer Neuens testified that, upon his arrival the victim "was hysterical" and that it took him "10–15 minutes to calm her down." *Id.* Thereafter, the victim provided Officer Neuens with a statement, which he recounted at trial, that the man, Mr. Davis, had forced her down an alley, "hit her and kicked at her[,]" and then sexually assaulted her. *Id.* at 716.

With that evidentiary foundation, we concluded that the victim's statement to Officer Neuens was properly admitted as an excited utterance. *Id.* at 716-17. With respect to the timing of the statement, we noted that although "Officer Neuens testified that the victim was 'calmed down' to where she could answer his questions," she nonetheless remained "emotionally agitated by the events she had experienced a short time before the police arrived." *Davis*, 125 Md. App. at 716. We found the statement was "spontaneous" and explained that "nothing more [was] required to establish an excited utterance" especially given the severity of the startling event and the fact that "the time from the startling event to the recitation by the victim was a scant fifteen minutes." *Id.* at 716-17, 719.

In *Harmony v. State*, we explained that the temporal limitations of the excited utterance exception may vary even further depending on the evolving nature of the startling event. 88 Md. App. 306 (1991).[5] There, the defendant was accused of battery and sexual

<hr/>

[5] *Harmony* was decided before Maryland Rule 5-803 was adopted in 1993. Nonetheless, as Professor McLain has explained, Rule 5-803 "codified the excited utterance hearsay exception, long recognized by Maryland case law[.]" 6A LYNN MCLAIN,

continued …

offenses when he, while isolated with his niece, "made a comment about how much she had grown, touched her breasts, and wrapped a cord around her." *Id.* at 311. The testimony at trial established that the victim "became very upset, ran upstairs and locked herself in the bathroom[,]" later telling her father that the defendant "was abusing me." *Id.* Even later still, the victim called her sister, who was permitted to testify, over objection, that the victim had called her "crying hysterically, and stating '[the defendant] . . . grabbed me . . . and this is not the first time, this has happened before.'" *Id.*

Despite the approximately 3 hours that intervened between the unwanted touching and the victim's emotional call with her sister, we concluded that her statement that the defendant grabbed her "not for the first time" constituted an excited utterance. *Id.* at 317-18, 319. We explained that the "utterance need not be contemporaneous or simultaneous with the principal act" so long as "the exciting influence has not lost its sway or been dissipated by meditation." *Id.* at 320 (quoting *Deloso*, 37 Md. App. at 106). Thus, "the crucial factor is not so much the lapse of time or change of location but the continuance of a situation which insures that what is said is, in fact, a spontaneous reaction to the occurrence[.]" *Harmony*, 88 Md. App. at 320 (quoting *Deloso*, 37 Md. App. at 106). We reasoned that even if "the declaration [to the victim's sister] was made three hours after the

---

MARYLAND EVIDENCE STATE AND FEDERAL 444 (3d ed. 2013). Accordingly, cases such as *Harmony* remain good law despite predating the Rule. *See Morten v. State*, 242 Md. App. 537, 549 (2019) (citing to *Harmony*, 88 Md. App. at 320, to support the proposition that under the excited utterance exception, "the declarant must still be in the throes of the exciting event when he or she makes the out-of-court assertion in issue"); *Vigna v. State*, 241 Md. App. 704, 730 (2019) (quoting *Harmony* at 321 to explain "[a] complaint of sexual assault may be considered prompt if the victim's statement is made 'without a delay which is unexplained or is inconsistent with the occurrence of the offense'").

incident" it was nonetheless admissible as an excited utterance because the victim was still "in the throes of" the startling event. *Id.* Indeed, we emphasized that "[t]he victim was upset enough after the incident to lock herself in a bathroom, crying" and was still crying when she called her sister "in the course of the same evening as the incident of abuse." *Id.* We concluded that, under the circumstances, "it was unlikely that the 'exciting influence' of the incident had subsided to the extent that she was capable of forethought or deliberate design in her conversation with her sister." *Id.* at 320-21. Thus, we held the circuit court did not abuse its discretion in admitting the statement because there was a "sufficient foundation to find that the statement was uttered spontaneously[.]" *Id.* at 321.

It is axiomatic that the ongoing nature of the exciting event bears on whether the declarant was under the stress of the event at the time of the statement. In *Stanley v. State*, the defense objected to admission of statements made by the victim of a battery under the excited utterance exception to the hearsay rule where the "record did not disclose with specificity the amount of time that elapsed between the alleged attack and her statements" to the officer riding in the ambulance with her. 118 Md. App. 45, 54 (1997), *aff'd in part, vacated in part on other grounds*, 351 Md. 733 (1998). We held that the trial court was correct in its determination that the victim was still under the stress and excitement of the event at the time of her statements, explaining:

> [t]he traumatic and exciting event remained ongoing at least until the victim was separated from appellant, and perhaps continued further. When the victim made her statements to Trooper White, she had been physically separated from appellant for only a matter of minutes. Nevertheless, the victim, while undergoing medical treatment in the ambulance, could see appellant standing just outside.

*Id.* at 55-56.

This Court's more recent opinion in *Morten v. State*, 242 Md. App. 537 (2019), highlights why the identity of the declarant and the content of the challenged statement are also significant considerations in determining whether the declarant had personal knowledge of the startling event, and whether the declarant was still under stress of that startling event when the statement was made. In *Morten,* we examined the admissibility of an anonymous 911 call that was recorded and played for the jury at trial as an excited utterance. *Id.* at 542-43. The call came in approximately 35 minutes after the shooting, the underlying startling event, and described in meticulous detail two individuals running up an alley and discarding an item into a nearby backyard, as well as the race, approximate age, and clothing of the suspects. *Id.* Because the declarant was an observer, rather than a victim, and only claimed to have heard a gunshot from several blocks away, we could not accept that the statement was an "uncontrolled emotional spasm in response to overpowering excitement." *Id.* at 552. Instead, we emphasized that the content of the statement reflected "a conscious and reflective choice of a good citizen to help the police solve a crime" through a "cool and controlled narrative." *Id.* Accordingly, we concluded that the statement was "an admirably unexcited utterance." *Id.*

## C. *Analysis*

We return to the case at bar and examine whether the trial court erred in admitting, under the excited utterance exception to the hearsay rule, Ms. Day's testimony that Ms. Hockaday told her that she was "afraid of her boyfriend." In doing so, we examine the totality of the circumstances and consider the factors identified in our decisional law that

assist trial courts in determining whether a statement qualifies as an excited utterance, such as the amount of time that has passed since the startling event, *Morten*, 242 Md. App. at 548-49; whether the statement was made in response to an inquiry, *Harrell*, 348 Md. at 77; and whether the declarant is a victim who actually experienced the startling event and remained in an emotional state. *Davis*, 125 Md. App. at 716-17.

Initially, we observe that in this case personal knowledge and the ongoing stress of the startling event were established because the statement was given by the victim while her assailant remained nearby. *Morten*, 242 Md. App. at 549 (citation omitted); *Stanley*, 118 Md. App. at 56. And there is no dispute that the statement by Ms. Hockaday identifying her assailant as her boyfriend "relat[ed] to a startling event or condition." Rule 5-803(b)(2). We also note that the record does not contain any facts that suggest Ms. Hockaday's statement was "self-serving[,]" *Gordon*, 431 Md. at 536 (citation omitted); or that it was given in response to any investigatory inquiry by Ms. Day. *Harrell*, 348 Md. at 77. This case turns on the requirement that the statement must have been "made while the declarant was under the stress of excitement caused by the startling event or condition." Rule 5-803(b)(2).

The record establishes that Ms. Hockaday ran, barefoot and crying, out of her home in the early morning hours of December 11, 2020. Upon encountering Ms. Day, Ms. Hockaday pleaded for help and then she ran into Ms. Day's apartment. Ms. Hockaday's emotional state as described by Ms. Day suggests that she was running from a startling event and that she was "still in the throes" of that event. *Harmony*, 88 Md. App. at 320. Because of the ongoing nature of the intimate partner abuse in this case, it was reasonable

for the trial court to conclude that at least part of the startling event—the assault—had already taken place.  In any case, Appellant does not argue that Ms. Hockaday was *never* under the stress of a startling event prior to her conversation with Ms. Day.  Instead, Appellant's argument is trained on the State's failure to establish exactly "how much time elapsed before Ms. Hockaday purportedly made her statement" once inside Ms. Day's apartment.

As to the latter point, we agree that the record does not reveal the exact amount of time that passed between Ms. Day's initial encounter with Ms. Hockaday and the statement at issue.  However, applying the principles distilled from the caselaw examined above, we conclude that, under the circumstances, it was not necessary to establish the precise quantum of time that elapsed between the event that caused Ms. Hockaday to run out of her home in the middle of the night and the statement that she made after she ran inside Ms. Day's apartment.  We note that, based on Ms. Day's testimony, the time that elapsed between the initial encounter in the parking lot and Ms. Hockaday's statement inside the apartment does not appear to have been significant.  Indeed, Ms. Day offered Ms. Hockaday's statement in response to the State's question: "When she went into your house, what did you do next?"  However, even if we assume the time lapse was more than a few minutes—because Ms. Day did testify that she and Ms. Hockaday spoke for approximately one hour before Ms. Day went to her bedroom—we still conclude that the statement was admissible as an excited utterance under the circumstances.

In this regard, we consider *Harmony* to be particularly instructive.  In that case, despite a time lapse of *approximately three hours* between the sexual assault and the

38

victim's statement, we held that her statement was nonetheless admissible as an excited utterance. *Harmony*, 88 Md. App. at 320. We reasoned that the factual circumstances adduced at trial suggested that she was still in the "throes" of the assault because she "was upset enough after the incident to lock herself in a bathroom, crying" and was still crying when she called her sister "in the course of the same evening as the incident of abuse." *Id.*

Here, just like the victim in *Harmony*, Ms. Hockaday was in the midst of an evolving situation when she spoke to Ms. Day in her apartment. Ms. Day testified that Ms. Hockaday was crying and fearful when she made her statement. Ms. Hockaday's fears were realized when her boyfriend, Appellant, entered Ms. Day's apartment where he beat and strangled her. With the threat of violence and the nearby presence of her abuser, it is highly probable that Ms. Hockaday was "emotionally engulfed" by the earlier, as well as the ongoing, events. *Harrell*, 348 Md. at 78 (quotation omitted). Accordingly, we hold that Ms. Hockaday's frenzied demeanor—established by the testimony that she ran out of her home, barefoot and crying, in the middle of the night—together with Ms. Hockaday's pleas for help and her palpable fear of continuing and imminent danger, constituted sufficient foundation for the court to find that Ms. Hockaday was still under the stress of a startling event when she made her statement to Ms. Day. And, for the same reasons provided at the conclusion of our analysis in Section I of our discussion, we hold that if there was any error in admitting the statement, it was harmless beyond a reasonable doubt. *Dorsey v. State*, 276 Md. 638, 659 (1976).

Accordingly, we shall affirm Appellant's convictions.

39

**JUDGMENTS OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**